## BURMAN COMPANY v. ED ZAHLER.

178 N. W. (2d) 234.

March 26, 1970—No. 41849.

*Culhane & Culhane, Michael L. Culhane,* and *James E. Culhane,* for appellant.

*Eckberg & Lammers* and *James F. Lammers,* for respondent.

Heard before Nelson, Rogosheske, Sheran, Frank T. Gallagher, and Theodore B. Knudson, JJ.

SHERAN, JUSTICE.

Appeal from an order of the district court denying an alternative motion for amended findings or for a new trial.

Action was instituted by Burman Company, a corporation, against Ed Zahler to recover approximately $6,500 alleged to be due for plumbing supplies delivered by plaintiff to Lake Plumbing and Heating, Inc., in White Bear Lake, Minnesota, during the period from about July 1, 1962, to about March 1, 1963. By answer, defendant denied that he had ever purchased any goods from plaintiff and asserted that he was not indebted to the plaintiff in any amount whatever. No affirmative defenses were pleaded.

At trial before the court without a jury, resolution of the dispute depended on whether an agency relationship existed between defendant and one George Stafki, either as master and servant[1] or joint adventurers,[2] during the period from July 1,

---

[1] See, Rochester Dairy Co. v. Christgau, 217 Minn. 460, 14 N. W. (2d) 780; Frankle v. Twedt, 234 Minn. 42, 47 N. W. (2d) 482.

[2] See, Church v. Odell, 100 Minn. 98, 110 N. W. 346; National Surety Co. v. Winslow, 143 Minn. 66, 173 N. W. 181; Standard Clothing Co. v. Wolf, 219 Minn. 128, 17 N. W. (2d) 329.

1962, to March 1, 1963. The trial court found as a fact that there was no such relationship and the basic issue on appeal is whether this finding can be sustained in light of evidence disclosed by the record. In our judgment, the evidence established the agency relationship and the order appealed from must be reversed.

For approximately 40 years before July 1, 1962, defendant was a lumber supplier and general contractor at Withrow, Minnesota, near White Bear Lake.

For about 2 years before July 1962, the plumbing work in houses constructed by defendant had been done exclusively by George Stafki, a master plumber and plumbing contractor who operated out of his house in White Bear Lake and who was awarded plumbing subcontracts by defendant on the basis of bids submitted prior to the commencement of the work. During this period, Stafki personally maintained his business records in his home. He kept his tools and inventory either in trucks used in connection with his business or in a storage building near his house.

Plaintiff, Burman Company, was engaged in the business of selling plumbing supplies at wholesale. With an office in Minneapolis, it had three salesmen, one of whom, James W. Burns, was responsible for sales in the White Bear Lake area. Through Burns, Burman Company had been supplying materials on open account to Stafki for a considerable time before July 1, 1962. Stafki's indebtedness at that time was approximately $1,000.

About July 1, 1962, Stafki and defendant engaged in conversations about the sale of Stafki's plumbing business to defendant. The substance and effect of these conversations are disputed.

Stafki testified that an agreement was effected embracing these terms: The inventory and equipment of Stafki's business, Lake Plumbing and Heating, was transferred to defendant and in exchange defendant agreed (a) to pay Stafki the sum of $5,651.46, the stipulated value of the inventory and equipment, and (b) to take over the business, employing Stafki to run it for

hourly wages of $3.50 per hour plus 20 percent of the net profits. It was understood, Stafki testified, that he would keep the accounts receivable outstanding as of that date and be responsible for the outstanding accounts payable, including the $1,000 owed to Burman.

These facts are helpful in evaluating Stafki's testimony concerning his "agreement" with defendant:

(a)  Stafki went on defendant's payroll for the week ending August 1, 1962. Defendant paid Stafki wages of $2,333.50 in 1962, and $738.50 in 1963, for a total of $3,072. Stafki kept a record of his time which he submitted to defendant weekly. Payments were made on defendant's regular payroll checks. Defendant withheld for income tax from these payments, paid social security on Stafki's behalf, and kept regular employment records concerning Stafki.

(b)  On August 27, 1962, defendant paid $2,000 owed by Stafki to St. John's Credit Union. Defendant then rented a building near his business site and placed a set of Stafki's tools and some of Stafki's inventory in it, obtaining insurance against loss or damage to this property.

(c)  Defendant made additional payments to Stafki in 1962 of $54.50 on August 9, $120 on September 27, $238 on October 12, and $500 on October 5, for a total of $2,912.50.

(d)  No bill of sale for the tools and supplies was ever drafted, though Stafki regarded an inventory of his tools, equipment, and supplies delivered to defendant in July 1962 as a bill of sale.

(e)  Stafki moved his center of operations from his own residence to defendant's office and kept all records there. During the period in question he did plumbing installations of the approximate value of $13,000 on houses being built by defendant. Stafki received over $12,000 for plumbing work done for others which was deposited to the Lake Plumbing account and used for

operating expenses and payments to plaintiff—all payments from this account being made by Stafki.

(f)    Stafki filed an income tax return for Lake Plumbing for the fiscal year from July 1, 1962, to June 30, 1963, and in it claimed depreciation for the tools and equipment referred to above. Stafki paid liability insurance on the trucks, title to which continued to be registered to Lake Plumbing. He arranged for performance bonds for Lake Plumbing jobs.

(g)    Defendant paid the wages of two of his employees who worked under Stafki's supervision. The men previously employed by Stafki were released.

(h)    During the period from July 1, 1962, to March 1, 1963, Stafki performed plumbing work on jobs contracted by defendant and on other jobs for which Stafki was successful bidder. On jobs of both categories Stafki planned and supervised the work, assisted by defendant's men.

(i)    In relation to defendant's construction, the practice was for Stafki to submit an "estimate" used by defendant as a factor in his construction costs. On the basis of Stafki's estimates, the value of the work he did for defendant during the period was about $13,000. Defendant has paid nothing for it although he has been paid for the completed construction.

(j)    Stafki made at least two payments to defendant during this period, one for $354, and one for $513.

(k)    The Lake Plumbing account with Burman for this period shows an opening balance of $1,096.28; charges of $18,736.15; credits of $13,343.01; and a closing balance of $6,489.42. Two credits ($574.80 and $494.52), according to Stafki, were in payment of the July 1, 1962, balance and came from funds provided by his wife.

Defendant, on the other hand, denied that he had bought Stafki's business. He claimed that during the period from July 1, 1962, to March 1, 1963, he was merely observing the operation run by Stafki in an effort to determine whether he should

take it over. The money paid to or for Stafki, defendant testified, was intended as loans or advancements to relieve Stafki's financial stress—not as payment on account of anticipated profits as Stafki asserted. Defendant claimed he took possession of tools and inventory owned by Stafki as security for money loaned and paid the wages of men who worked under Stafki's supervision only as an accommodation to Stafki, who was unable to do so without help.

Whatever the nature of the relationship, it ended about March 1, 1963. Stafki moved out of defendant's place of business, taking the tools, equipment, and inventory with him. No settlement of the claims between Stafki and defendant has ever been made.

We do not undertake to resolve the conflicting claims as to whether a sale was consummated as between defendant and Stafki. In our judgment, an agency relationship existed as between them during this period whether a sale was effected on July 1, 1962, or not. A person may be the agent of another even though he uses his own tools and equipment to accomplish the objects of the agency.[3] Thus, if Stafki did own the tools and equipment used in the work he did for defendant, that fact would not negate the existence of an agency relationship.

■ The business records of defendant and Stafki give almost conclusive support to Burman's claim that Stafki was an employee of defendant. The relationship of master and servant is a species of agency. Restatement, Agency (2d) § 2, provides:

"(1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance

---

[3] Pettis v. Harken, Inc. 263 Minn. 289, 116 N. W. (2d) 565, and cases collected in note 2. See, Boland v. Morrill, 270 Minn. 86, 132 N. W. (2d) 711; Restatement, Agency (2d) § 220, comment k.

of the service is controlled or is subject to the right to control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent."

Defendant prepared withholding tax statements with respect to Stafki for 1962 and 1963 showing total wages paid of $2,333.50 and $738.50 respectively. Defendant's own business records show payments of wages to Stafki during the last half of 1962. These business records demonstrate conclusively that the wages were paid at the rate of $3.50 per hour. The weekly payments were based on a record of hours worked which was kept by Stafki. Defendant's records for 1963 show wage payments for the weeks ending January 2, 9, 16, 23, 30, and February 6 and 13, also at the rate of $3.50 per hour. In addition, it is conceded that defendant withheld for Federal and state income taxes and also paid the employer contribution to the social security fund made necessary by these wage payments.

It is very significant that shortly after July 1962 Stafki transferred his operations from his home to defendant's place of business, where Stafki was given a desk and where he maintained his business records until the arrangement was ended in March 1963. It is clear that the wages paid to Stafki on an hourly basis were for hours expended because of plumbing installations in houses being constructed during this period, sometimes for defendant and sometimes for others. We must attribute to defendant certain knowledge that the work for which the wages were being paid necessarily entailed the procurement by Stafki of the materials and supplies needed to accomplish the work. In our judgment, this evidence of an employer-employee relationship proved by business records made contemporaneously with the existence of the relationship now in dispute compels a finding that the relationship existed notwithstanding self-serving testimony to the

contrary by defendant and his son, Edward M. Zahler, Jr., who testified for the defense.

Defendant's son testified, for example, that it was at his suggestion that Stafki was treated as an employee for business-record purposes. He was apprehensive, he said, that his father might be held responsible for the tax and social security withholding required to be made with respect to employees. The employer social security contribution was made, he testified, only because he considered it better to make the payment than to become involved in a dispute about it. But in the absence of corroboration by some disinterested witness, it seems to us that a self-serving, after-the-fact recitation cannot justify rejection of the inferences which the business records so clearly justify.[4]

---

[4] "By MR. LAMMERS [defendant's attorney]

"Q. Well, directing your attention just to the payments made that are shown on the W-2 forms, Mr. Zahler, do you know the purpose for which these payments were made?

&ast; &ast; &ast; &ast; &ast;

"THE COURT: Are you trying to vary your own books? You've introduced here records, exhibits which show what they were paid for.

&ast; &ast; &ast; &ast; &ast;

"Q. Mr. Zahler, why was money withheld?

&ast; &ast; &ast; &ast; &ast;

"Q. Mr. Zahler, was there any conversation between yourself, your father and Mr. Stafki regarding the withholding—

&ast; &ast; &ast; &ast; &ast;

"A. Not with Mr. Stafki. There was conversation between myself and my father.

&ast; &ast; &ast; &ast; &ast;

"Q. Do you know who directed the withholding, or the money to be withheld from these payments?

&ast; &ast; &ast; &ast; &ast;

"A. Myself.

&ast; &ast; &ast; &ast; &ast;

"Q. And what was the reason for this direction?

&ast; &ast; &ast; &ast; &ast;

"THE COURT: He has had no conversation with Mr. Stafki. Anything he does is purely self-serving, isn't it?

&ast; &ast; &ast; &ast; &ast;

Defendant's testimony with respect to his understanding of the arrangement, if we read the record correctly, was amorphous. The following is indicative of his position:

"The Court: When did this conversation, this alleged conversation take place? When you made out the W-2s at the end of the year, at the time you made up the tax returns?

\* \* \* \* \*

"The Witness: Probably in July or August of '62.

\* \* \* \* \*

"The Witness: No. I told my father that \* \* \* they would have to withhold, \* \* \* all regular type of payments there would have to be withholding.

\* \* \* \* \*

"The Court: Even though it was on a subcontract, advances on a subcontract, you would have to withhold? Now, keep in mind that you are an accountant.

\* \* \* \* \*

"The Witness: But any weekly or monthly regular type of payments would have to be withheld for.

"The Court: Even though they were on a debt owing or on a subcontract or on a bill or what? I would like to have you account to me what you mean by this.

"The Witness: \* \* \* I didn't clarify it to that point. I said any—any type of regular payment.

"The Court: For services rendered?

"The Witness: Right. Which could be construed by the Internal Revenue Bureau, by the widest, wildest stretch of the imagination, should be withheld from, to protect you from future Federal and State liability, tax liability.

"The Court: All right. So that in order to properly reflect on the books of this, on your father's books, that the payments that were being made that might be construed to be salary, there should be withholding withheld?

"The Witness: That is right.

"The Court: And your father should have to pay an additional four per cent, four and a half per cent for Social Security on this payment which would be entirely out of his pocket?

"The Witness: Right. I felt that was cheaper than coming up with the future personal tax liability on any of these people who he was connected with."

"The Court: What was he [Stafki] to receive?

\* \* \* \* \*

"The Witness: He got his wages for—for living, so he could keep aworking.

"The Court: Well, you just said now that was an advance, a draw.

"By Mr. Eckberg:

"Q. Well, was it a draw or what was it, Mr. Zahler?

"A. Well, we had to keep him working on our jobs in order to get our plumbing in.

\* \* \* \* \*

"Q. Well, when you speak about the adjustment, what was that on? Was that on the advance of salary or what was it?

"A. It was on the advance in salary; and also, well, I had the tools. And on all his other jobs, too, he was supposed to take care of books on that, on whatever he done, and I was supposed to look at them to see what was going on. \* \* \*

"The Court: Why were you interested in seeing anything that—in connection to the Lake Plumbing and Heating Company? What did you have to do with that?

"The Witness: Well, I wanted to see the records to see if it was a paying proposition. Otherwise, it was just his say-so.

"The Court: In the meantime, you were giving him money for working when he wasn't working; and he was supplying merchandise to you, according to your version of this thing, and you weren't paying him for that. When were you going to pay him?

"The Witness: I didn't pay him. \* \* \* at the end of the year we was going to take care of that. That's why I didn't pay him, why—the wages were going to come off first and then the materials.

"The Court: And then who was going to get the balance?

"The Witness: Well, at that time we didn't know.

\* \* \* \* \*

"The Court: Well, were you going to split the profits on all the jobs, including his jobs?

410

"THE WITNESS: No.

"THE COURT: At the end of the year?

"THE WITNESS: We didn't know if it was going to be a profit or not.

"THE COURT: If there was a profit?

"THE WITNESS: We never got that far.

"THE COURT: You were going to split the profits?

"THE WITNESS: At the time we didn't know."

It is true that there is evidence exclusive of oral testimony which is in some respects consistent with the theory that no agency relationship was consummated on July 1, 1962, and rescinded on or about March 1, 1963. The materials purchased from Burman were invoiced to Lake Plumbing and Heating after July 1, 1962, in the same way as had been the case before that date. Stafki kept title to the trucks which he used in connection with the business. Stafki paid premiums for workmen's compensation insurance, liability insurance, and for performance bonds out of a checking account maintained in the name of Lake Plumbing and Heating. Payments for some of the materials supplied by Burman were made from this account and receipts from jobs subcontracted from persons other than defendant were deposited to it. During this period, Stafki did collect over $12,000 on account of plumbing work done for builders other than defendant, placed that amount in the Lake Plumbing and Heating bank account, and used it for payments on the Burman account approximating that amount and for other operating expenses such as workmen's compensation premiums, performance bond premiums, and insurance premiums covering the trucks. And Stafki filed an income tax report for the fiscal year of July 1, 1962, to June 30, 1963, claiming depreciation on the tools and equipment. But these facts are not determinative of the issue which is critical: Was Stafki engaged in plumbing work during the period from July 1, 1962, to on or about March 1, 1963, as an employee of defendant or in a joint venture with him?

It is arguable that the requisite direction and control on the part of defendant for either an employer-employee relationship or a joint venture was not established. But whatever evidence on this question is to be found in the record leads to the conclusion that Stafki had placed himself subject to defendant during this period. Most significantly, he was on defendant's payroll. He operated his business from defendant's premises. He did work of the estimated worth and value of $13,000 on defendant's houses. He was never paid directly for this work. The two men who worked on plumbing installation jobs during the period, although subject to Stafki's supervision, were on defendant's payroll. The employees who worked for Stafki before July 1, 1962, were released. From these facts it appears to us that although defendant may not have given Stafki specific directions as to the conduct of the plumbing installations, defendant had the right of control and the power to make this right meaningful. This being the case, the extent to which he did in fact direct Stafki is of minimal significance.[5]

Our conclusion that defendant is responsible for indebtedness incurred with plaintiff by Stafki during the critical period is confirmed by, but not dependent upon, these additional considerations:

(a) Testimony was introduced in behalf of plaintiff that Stafki assured plaintiff's salesman in the presence of defendant that defendant would be responsible for the growing account and defendant then remained silent, thus inferentially acquiescing in this representation. Defendant's denial of this fact as it appears in the record, although adequate to support a finding in his favor on this fact issue, seems not compelling under all the circumstances.

(b) Although defendant denied that he was responsible for

---

[5] The right of control, and not necessarily the exercise of that right, is the test of the relation of master and servant. Cornish v. Kreuer, 179 Minn. 60, 228 N. W. 445.

the plumbing materials and supplies invoiced to Lake Plumbing and Heating, he acknowledged at the time of trial that about $13,000 worth of plumbing work had been done on houses which he had constructed and for which he had been paid. He acknowledged also that he had never made an adjustment or settlement of any kind with Stafki, Lake Plumbing and Heating, or anyone else with respect to this work. If, as defendant claimed at the time this case was tried, Stafki was not acting as an employee but was instead an individual contractor entitled to be paid the full amount of contracted services upon completion of his work less any sums advanced as wages or loans, we can see no adequate reason why he has withheld the full amount of $13,000 from Stafki during all this time. It is true that Stafki received about $3,000 from defendant either as payment for tools or as loans and that the tools were repossessed without full repayment. It is true, also, that defendant paid the wages of men who worked on jobs for which Stafki collected, using the money to pay operating expenses. Even so, so far as this record now shows, the amount owed Burman on March 1, 1963, (i. e., about $6,500) was substantially less than this $13,000 minus the amount claimed by defendant as due him from Stafki.

Relying on this version of the facts, plaintiff has urged that we find in its favor upon equitable grounds, contending that the result of the trial court's decision is to permit defendant to enrich himself at plaintiff's expense. This theory was not pleaded or urged at trial. There may be equities in defendant's favor not disclosed by the record. Decision of this question is not necessary at this time. We therefore decline to make a determination as to whether plaintiff could recover absent the agency relationship previously discussed.

Our holding is that the relationship of principal and agent as between defendant Ed Zahler and George Stafki during the period involved was and is established as a matter of law. A new trial with respect to any other issues which are or may be germane to the case is ordered. Our decision is not intended to

foreclose the assertion of any affirmative defenses which the trial court may consider proper in light of our holding that the principal-agent relationship existed as a matter of law.

Remanded for further proceedings consistent with this opinion.

Reversed and remanded.