*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0604**

James Bigham, et al.,
Appellants,

vs.

Dale W. Kleve,
Respondent.

**Filed February 9, 2015
Affirmed
Connolly, Judge**

Hennepin County District Court
File No. 27-CV-12-12251

Carl S. Wosmek, Christy E. Lawrie, Amy L. Court, McGrann Shea Carnival Straughn & Lamb, Chtd., Minneapolis, Minnesota (for appellants)

Paul C. Engh, Minneapolis, Minnesota (for respondent)

Considered and decided by Connolly, Presiding Judge; Halbrooks, Judge; and Bjorkman, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CONNOLLY**, Judge

Appellants, trustees of an employees' trust fund, challenge the judgment dismissing their claims that respondent was an alter ego of the corporation that employed

them and therefore personally liable for the corporation's unsecured debt to them and that respondent breached his fiduciary duty to them. Because the district court's legal conclusions are sustained by its findings and those findings are sustained by the evidence, we affirm.

## FACTS

In the late 1980's, respondent Dale Kleve and his brother, Dennis, acquired from their father the control and ownership of his business, Kleve Heating and Air Conditioning Inc. (Kleve). Kleve had been doing well and continued to do well; in 2003, it was planning to expand and leased additional warehouse space.

But Kleve's financial situation then declined due to several factors, including the recession and Dennis Kleve's theft of more than $500,000.[1] By the mid-2000s, Kleve was unable to meet its financial obligations. Secured obligations included loans amounting to about $1,800,000 from Anchor Bank (Anchor), of which $1,300,000 was secured by Kleve's real estate and $500,000 was secured by Kleve's other assets; respondent had personally guaranteed $250,000 of the $500,000. Kleve's unsecured obligations included the lease payments on the warehouse space and pension payments to its employees' trust fund, of which appellants are trustees.

Respondent, hoping to avoid bankruptcy and to keep Kleve going, consulted a lawyer. The lawyer recommended transferring Kleve's assets to a new company that could both provide money and secure additional financing.

---

[1] Dennis Kleve disappeared before the theft was discovered.

Respondent found an investor with whom he started Kleve Companies, which began to run the business. The original company's (i.e., Kleve's) name was changed to Mechanical Transitions Inc. (Kleve/MTI). The Klein Bank (Klein) agreed to satisfy $196,000 of Kleve/MTI's debt to Anchor in exchange for an interest in Kleve Companies' assets. Anchor also required that respondent give up his ownership interest in Kleve Companies, in exchange for which Anchor forgave $190,000 of the $250,000 debt guaranteed by respondent, leaving him as guarantor of a debt of $60,000, and released its secured interests in the assets of Kleve/MTI. Kleve/MTI transferred the assets to Kleve Companies, and Klein had a secured interest in those assets. As to the unsecured debts, the lawyer recommended defaulting on the warehouse lease and on Kleve/MTI's debt to appellants.

Appellants then sued Kleve/MTI in federal court. The parties stipulated to a default judgment for appellants against Kleve/MTI for $516,858.54. Because appellants could not collect the judgment, they brought this action against respondent in state court. Appellants claimed the corporate veil should be pierced and respondent held personally liable for the debts of Kleve/MTI because he was its alter ego and that respondent breached a fiduciary duty to appellants by preferring his own interests to their interests when disposing of Kleve/MTI's assets. Following a bench trial, the district court concluded that respondent was not personally liable for Kleve/MTI's debts and dismissed appellants' claims with prejudice. Appellants did not move for a new trial.

They challenge the dismissal of their claims, arguing that the district court's findings that respondent was not the alter ego of Kleve/MTI, that no fundamental

3

injustice occurred to appellants because of respondent's acts, and that respondent did not breach a fiduciary duty to appellants are not sustained by the evidence.[2]

# D E C I S I O N

When no motion for a new trial has been made, the only questions for review are whether the evidence sustains the findings of fact and whether the findings sustain the conclusions of law and the judgment. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976).

## 1.    Respondent as the alter ego of MTI

> Factors considered significant in the determination [of whether to pierce the corporate veil, or hold an individual liable for a corporation's debt] include: [1] insufficient capitalization for purposes of corporate undertaking, [2] failure to observe corporate formalities, [3] nonpayment of dividends, [4] insolvency of debtor corporation at time of transaction in question, [5] siphoning of funds by dominant shareholder, [6] nonfunctioning of other officers and directors, [7] absence of corporate records, and [8] existence of corporation as merely [a] facade for individual dealings.
> . . . .
> Disregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness.

---

[2] Appellants also argue that the district court erred in admitting testimony challenging the amount of the federal judgment. But, even if this testimony was erroneously admitted, appellants do not show that its admission prejudiced them in any way, and, absent a showing of prejudice, appellants would not have been entitled to a new trial on the basis of erroneously admitted evidence. *See Kroning v. State Farm Auto Ins. Co.*, 567 N.W.2d 42, 46 (Minn. 1997) (holding that a party must demonstrate that an error in admitting evidence was prejudicial to be entitled to a new trial on that basis); *see also Gruenhagen, v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976) (limiting this court's scope of review to whether the evidence sustains the district court's finding of facts and whether the findings of fact support the conclusions of law and the judgment).

*Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979) (citation omitted). In applying this test, "courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." *Id*. (quotation omitted).

### A. The eight factors

The district court found that two of the eight *Victoria* factors were not satisfied. As to factor 5, whether the dominant shareholder siphoned corporate funds, it found that "the evidence shows that [respondent] tried to keep [Kleve/MTI] going by injecting it with more than $100,000 of his own money and even his own personal credit card debt"; as to factor 8, whether the corporation was a façade for individual dealings, it found that "[t]here is nothing in the record, and [appellants] do not allege, that [they were] ever fooled into believing that [they were] dealing with a company when [they were], in fact, dealing with [respondent]." The evidence showed that Kleve Companies, not respondent, was ultimately the entity with which appellants were dealing because respondent had been required to give up his ownership interest in Kleve Companies.

The district court also found that, while the other six factors were satisfied, the circumstances in which they were satisfied meant they either failed to indicate an alter ego relationship between respondent and Kleve/MTI or were irrelevant. As to factor 2, observing corporate formalities, and factor 7, keeping corporate records, the district court found that Kleve/MTI's failure to do these things reflected its status as one part of the complex workout scheme designed by respondent's attorney, not respondent's status as the alter ego of Kleve/MTI. Factor 6, the nonfunctioning of other corporate officers, was

5

due to the fact that the other corporate officer was respondent's brother, who stole $500,000 and disappeared. Finally, factor 1 (insufficient capitalization), factor 3 (nonpayment of dividends), and factor 4 (insolvency at the time of a transaction), did not exist at the time Kleve/MTI agreed to pay pension benefits into the employees' trust fund; after making those payments became impossible, these factors would inevitably be present in a company that was failing and restructuring to avoid bankruptcy. The evidence sustains the district court's finding that none of the factors indicates that respondent was an alter ego of Kleve/MTI.

### B.    Injustice or fundamental unfairness

"[T]here can be no piercing of the veil without a showing of improper conduct." *Ass'n of Mill and Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. App. 1996), *review denied* (Minn. Nov. 20, 1996). The district court found that (1) "the extent to which [respondent] continued (or continues) to benefit from later iterations [of Kleve/MTI] is speculation at best" because respondent was forced out of Kleve/MTI by Anchor when the assets were transferred from Kleve/MTI to Kleve Companies and (2) appellants' "assumption that [Kleve/MTI] would have been able to pay [appellants'] judgment if it had gone through bankruptcy in lieu of workout . . . flatly contradicts the credible testimony of [Kleve/MTI's] attorney." These findings are sustained in part by appellants' attorney's answers to the district court's questions.

> Q.    What's the evidence that [Kleve/MTI] had more money than they owed their secured creditors?
> A.    . . . [W]ell, the evidence is their own financial statements . . . .

6

Q.     So I would have to rely on those financial statements that they said that they didn't really know about over their testimony?

. . . .

A.     . . . [W]e believe that the [financial statements] establish that the value of the assets of this company at the time of the transaction exceeded the value of the loan. . . .

Q.     Let me just put details on that.  . . . [T]he date that you're talking about is what date?

A.     It's at the end of 2010.

Q.     . . . [A]nd at the end of 2010, what do you believe the asset[s are] worth?

A.     Their books say approximately 1.6 million.

. . . .

Q.     Okay.  And . . . so the assets are 1.6 million.

A.     But that's just the company.  The real estate assets are another million.

. . . .

Q.     . . . [S]o you are saying that the assets are more than the secured debt?

A.     Yes.

Q.     Okay.  And what's the amount of the secured debt?

A.     For the companies it was 400 and some thousand dollars.

Q.     And the assets were 2.6 million, is that what you are [saying]?

A.     1.6 million.

Q.     But that's not all the assets that you claim.

A.     That's right.  We claim that the $1.6 million number doesn't include anything—any value at all for goodwill of the company which in 2009 they had on their books at $223,000.

Q.     And so what do you think the assets are at the time of the end of 2010?

A.     We believe they're in the range of 1.7 to 1.8 million.

Q.     So then the company is not insolvent.

A.     No, the company is insolvent because those financial records don't include a million dollars worth of debt to the trustees and to their corporate landlord.

Q.     So you think that the secured and unsecured debt is 1.4 million; is that right?

A.     In 2010 it would be 1—well, it would be a million— well it—if it's the case that the property debt,—I mean, there is property debt.

Q. Do you understand—you understand I'm going to have to make findings of fact on all these things?

A. Yes.

Q. And I'm hoping that you have some theory about what are these numbers and what are the relevant numbers.

A. Yes.

. . . .

Q. So I don't understand why it's hard for you to just tell me these numbers now.

A. . . . [W]e believe the range of the assets of the company were 1.6 [million]. . . . You know, goodwill should be added in there. . . .

. . . [T]he value of the transaction to sell all of these assets was only $196,000.

Q. Okay. So I understand their evidence about why they think that that's the correct valuation, because they shopped around and did the best they could and . . . in fact . . . [respondent] had to pick up the balance of some of the debt owed.

A. Yes.

Q. So there is incentives and reasons to take the 196 [thousand] as a good valuation.

A. That's correct.

Q. And you want me to rely on these other budgets and things like that to find that it's 1.6 [million] and not 196 [thousand]?

A. That's correct.

The district court's finding that "Bad fortune—not fundamental unfairness or injustice associated with [respondent's] alleged alter ego relationship to [Kleve/MTI]—is the cause of [appellants'] losses" is supported by the evidence that Kleve/MTI's assets were purchased for $196,000 and the absence of evidence that they were worth the $1.6 million claimed by appellants.

The district court concluded that respondent is not accused of misuse or misappropriation of Kleve/MTI's funds, and, absent such misuse or misappropriation, his decision to pay the proceeds of the asset sale to Anchor, a secured creditor, rather than to

8

appellants, unsecured creditors, is not a basis for disregarding Kleve/MTI's corporate status and finding respondent personally liable for its debt. *See Ass'n of Mill and Elevator Mut. Ins. Co.*, 553 N.W.2d at 450 (reversing district court's decision to disregard corporate entity of a subsidiary in part because there was no inherent unfairness in the parent corporation's decision to pay down a secured bank's line of credit rather than pay unsecured trade creditors).

Appellants rely on *Burman Co. v. Zahler*, 286 Minn. 400, 178 N.W.2d 234 (1970) to argue that "it is clear error for a trial court to disregard the business records in favor of later self-serving oral testimony." But *Burman* is readily distinguishable. In that case, a plumbing-supply company brought an action against a contractor who it claimed was liable for a plumber's debt because an agency relationship or an employer-employee relationship existed between the contractor and the plumber. *Id.* at 401-02, 178 N.W.2d at 236. The district court concluded that the contractor was not liable, in part based on the contractor's testimony that (1) he had not purchased the plumber's business; (2) any payments to or on behalf of the plumber were loans or advancement to relieve the plumber's financial stress, not as payment of anticipated profits; (3) he had taken the plumber's tools and inventory as security for money loaned to the plumber; and (4) he had paid the wages of the men who worked under the plumber's supervision as an accommodation to the plumber, who could not pay them. *Id.* at 404-05, 178 N.W.2d at 237-38.

The supreme court reversed, noting that the contractor's testimony was "amorphous" and that "whatever evidence . . . is to be found in the record leads to the

9

conclusion that [the plumber] had placed himself subject to [the contractor] . . . ." *Id.* at 411, 178 N.W.2d at 241. That evidence included the contractor's and plumber's business records, which "[gave] almost conclusive support to . . . [the] claim that [the plumber] was an employee of [the contractor]." *Id.* at 405, 178 N.W.2d at 238. The reversal was also supported by: (1) the plumber's testimony that he and the contractor had agreed that his inventory and equipment would be transferred to the contractor, who would pay him its stipulated value and would take over the plumbing business, employing the plumber to run it for an hourly wage and a percentage of the net profits, *id.* at 402-03, 178 N.W.2d at 236; (2) testimony that the plumber had assured the supply company, in the presence of the contractor, "that [the contractor] would be responsible for the growing account and [the contractor] remained silent, thus inferentially acquiescing in this representation," *id.* at 411, 178 N.W.2d at 241; and (3) the fact that contractor "acknowledged at the time of trial that about $13,000 worth of plumbing work had been done on houses which he had constructed and for which he had been paid . . . [but] . . . he had never made an adjustment or settlement of any kind with [the plumber] or anyone else with respect to this work." *Id.* Thus, *Burman* was not a simple rejection of one party's testimony that no relationship existed in favor of business records indicating that a relationship did exist; the existence of the relationship was supported by other testamentary and documentary evidence.

Here, no evidence supports the business records. As the district court noted, appellants "did not explain who prepared the estimates [of the value of Kleve/MTI's assets], that person's qualifications, the methodology used in their preparation,

assumptions underlying the estimates, or the circumstances under which they were prepared" and "the mere existence of these [business] records is not enough to overcome the strong evidence that they are erroneous."[3]

A district court's findings of fact, "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01. Appellants have not shown that the district court's findings of fact were clearly erroneous or that the evidence does not sustain them. *See Gruenhagen*, 310 Minn. at 458, 246 N.W.2d at 569.

## 2. Breach of fiduciary duty

Relying on *Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 869 (Minn. 1981) (holding that, when a corporation becomes insolvent, its officers and directors become fiduciaries of corporate assets for the benefit of creditors), appellants argue in the alternative that respondent had a fiduciary duty to them as creditors of Kleve/MTI and breached that duty because he sold the assets for less than market value to protect himself from secondary liability to Anchor. The district court found that "[respondent] has met his secondary burden to show that the sale of [Kleve/MTI's] assets did not constitute an unwarranted preference for his own individual interests over those of [appellants]" because "the value of [its] assets was not high enough . . . to pay off its entire debt to

---

[3] Appellants also argue that, because respondent stipulated to the admission of some business records, the district court should have excluded any testimony challenging or contradicting those records. But respondent stipulated that the documents were admissible; he did not stipulate that they were free from error.

Anchor Bank and its debt to [appellants]" and, even if the debt to appellants could have been paid off, "the asset sale would still not constitute an illicit preference" because "[respondent] continued to personally owe Anchor Bank . . . $60,000 on the loan [to Kleve/MTI] for which he was secondarily liable."

The district court found that appellants failed to show that respondent breached a duty to them by attempting to keep Kleve/MTI in business, that the bankruptcy of Kleve/MTI would have resulted in payment to its unsecured creditors, or that appellants were damaged in any particular calculable amount, all of which were essential to their claim of a breached fiduciary duty.

Evidence sustains the district court's findings, and those findings sustain its legal conclusions that respondent is not liable for Kleve/MTI's debt to appellants either because he was an alter ego of Kleve/MTI or because he had and breached a fiduciary duty to appellants.

**Affirmed.**