In re Orrin A. ERICSON, Bankrupt.

Victor G. LANDS, M.D., Plaintiff,

v.

Orrin A. ERICSON, Defendant.

Bankruptcy No. 4–79 BKY 139.
Adv. No. C–8.

United States Bankruptcy Court,
D. Minnesota.

May 14, 1985.

James L. Wahlfors, Ronald H. Groth, Thompson, Wahlfors, Moran & Groth, Ltd., Minneapolis, Minn., for debtor/defendant.

Hyman Edelman, Maslon, Edelman, Borman & Brand, Minneapolis, Minn., for plaintiff.

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled matter came on for trial on October 22 and 23, 1984, before the Honorable Margaret A. Mahoney, Bankruptcy Judge. This cause of action arises out of allegations by Plaintiff of certain fraudulent conduct on behalf of Defendant Orrin Ericson which, if properly established, would result in a denial of Defendant's discharge pursuant to section 14(c) of the Bankruptcy Act and 18 U.S.C. § 152. This Court has jurisdiction over and the power to hear and determine this matter pursuant to 28 U.S.C. §§ 1334 and 157, and Judge Lord's July 27, 1984, Order of Reference.

## FACTS

On February 8, 1979, involuntary bankruptcy proceedings were instituted against Ericson. Subsequently, on May 7, 1979, Ericson commenced voluntary Chapter XI proceedings, filing his bankruptcy schedules simultaneously. A few months later, on September 28, 1979, Ericson Development Company, of which Ericson was president and sole shareholder, similarly commenced Chapter XI proceedings and filed its bankruptcy schedules.

While both Ericson's and EDC's bankruptcy schedules disclosed a number of potential interests in proposed shopping centers around the country, neither contained any reference to a potential shopping center in either Sheboygan, Wisconsin, or Pomona, California. It is this nondisclosure of potential shopping center interests that forms the basis for Plaintiff's cause of action.

### A. *Background*

Ericson's first involvement in shopping center development began in the early 1960's. Apparently not long thereafter, he formed Ericson Development Company, Inc. (EDC), of which he was the president and sole shareholder, for the purpose of engaging in the development and redevelopment of shopping centers throughout the United States. Through the years EDC refined its approach to shopping center development into the following nine-step procedure:

(1) Find a location in a city with sufficient demand.

(2) Attempt to purchase or obtain an option to purchase the subject property.

(3) Prepare a preliminary architectural plan and obtain the requisite city approvals.

(4) Locate an anchor tenant and obtain approval of the plan and a firm commitment for a long term lease.

(5) Prelease approximately 50% to 75% of the projected space.

(6) Complete working draft of architectural drawings.

(7) Locate necessary financing. Where less than 100% of financing is obtained, locate investors willing to become limited partners.

(8) Establish construction costs based on architectural drawings.

(9) Commence construction.

By the early 1980's, if not before, EDC was apparently staffed by several employees. At the time of the filing of EDC's bankruptcy schedules and statement of affairs, its corporate officers were as follows:

| | |
|---|---|
| Orrin A. Ericson | President and Treasurer |
| James Russell Sveiven | Vice President |
| John E. Stewart | Vice President |
| John Borah | Vice President |
| Jack McLaughlin | Vice President |
| James W. Meunier | Secretary |

The record indicates that, while Orrin Ericson may have retained veto power over much of the decision-making authority of the other officers, the officers of EDC were generally vested with significant responsibility.

On December 29, 1976, Ericson created a second corporation in which he named his

sons Scott and Rick, aged 21 and 17 respectively, as the sole shareholders.[1] This corporation, named Ericson Brothers Properties Company (EBPC), was ostensibly created for the primary purpose of acquiring, developing, building, managing, and leasing real property—a purpose apparently substantially similar to that of EDC. Ericson's testimony indicated, however, that EBPC's bank account was used to pay certain accounts of EDC as EDC was unable to maintain its own bank account without it being attached. Moreover, while Ericson was neither an officer nor director of EBPC, he was actively involved in controlling the day to day business affairs of that corporation, including all business decisions concerning the receipt and disbursement of monies, and the acquisition and sale of property. The record indicates that everything EBPC did was in actuality for Ericson or EDC.[2]

Both Ericson and EDC commenced what was to become an ongoing business relationship with the Plaintiff, Victor Lands, as early as approximately 1976 or 1977 when Ericson first presented Lands with prospective shopping center developments as potential investment opportunities. Lands subsequently began investing funds in various EDC projects in return for which he became a limited partner in such projects. In total, Lands' investments in the EDC projects apparently equaled several hundred thousand dollars.

### B. Chronology of Plaza Eight Shopping Center Development [3]

As early as November 1978, Ericson had begun negotiating on behalf of EDC for the right to develop a downtown retail shopping complex in Sheboygan, Wisconsin. In response to these preliminary negotiations, on February 6, 1979, the Sheboygan Director of City Development, Frank Paquette, wrote Ericson indicating that they would not negotiate a development contract with any developer other than Ericson for a period of three months. Enclosed with the February 6 letter was a Preliminary Development Agreement signed by Paquette. The agreement restated the information contained in the letter and further provided that should a feasible development plan, acceptable to both parties, be finalized, the parties would then enter into a comprehensive development agreement. Absent an acceptable plan, the agreement provided that all rights and duties of both parties shall terminate.

While the Preliminary Development Agreement was apparently never signed by Ericson, subsequent conduct by EDC indicated its reliance thereon. On February 9, 1979, the day following the commencement of involuntary bankruptcy proceedings against Ericson, EDC vice president Gene Rezac wrote Paquette commenting on the status of the project as well as on the exclusive three month period. Rezac enclosed with the letter a proposed final de-

1. The evidence was somewhat contradictory on this point. The articles of incorporation list the directors of the corporation as *John* and Scott Ericson, as well as a third individual. At one point, Ericson's testimony indicated that his son John was a shareholder along with Scott. Later testimony supplanted Ericson's son Richard as a shareholder in lieu of John. The evidence is clear, however, that only Ericson's sons were shareholders of the corporation. At no time was Ericson ever a shareholder thereof.

2. It is not altogether clear just how pervasive Ericson's control over EBPC was. Ericson acknowledged, however, that in his deposition he conceded the possibility that "control" of EBPC meant actual ownership of the corporation. Absent stronger evidence to the effect that Ericson's sons had somehow yielded ownership of

the corporation to Ericson, though, such is insufficient to counter the otherwise clear indication on the record that Ericson is not and has never been a shareholder of EBPC.

3. At the close of Plaintiff's case, counsel for Ericson moved for "directed verdict" on all issues. The motion was granted as to Ericson's nondisclosure of any interest in the Sheboygan shopping center project. As I believe the motion should more properly be characterized as a motion for involuntary dismissal pursuant to Bankruptcy Rule 7041 and Fed.R.Civ.P. 41(b), I am compelled to find the facts specially and state separately my conclusion of law thereon. *See* Bankruptcy Rule 7041, 7052; Fed.R.Civ.P. 41(b), 52(a). The Plaza Eight chronology included herein is intended to serve as my factual finding on the Sheboygan issue.

velopment agreement which in effect constituted a financing plan for the project.

On May 23, 1979, subsequent to the filing of Ericson's bankruptcy petition and schedules, both EDC and Ericson entered into an agreement with an investor and developer named Donald Bergman. Pursuant to the agreement, and as a result of expenses incurred by Ericson and EDC on Sheboygan and other developments, Ericson and EDC agreed to sell, assign, and transfer all of their right, title, and interest in the projects to Bergman.[4] The agreement further provided that following confirmation of a plan of arrangement in Ericson's and EDC's anticipated joint bankruptcy, Bergman would assign all rights in the projects to a partnership owned one-half by Bergman and one-half by Ericson. As indicated in the agreement and explained by Ericson, the purpose behind this agreement was in part to generate the necessary revenue through the new partnership to fund a confirmed plan.[5]

The parties replaced the May 23 agreement on August 10, 1979, through the execution of a new agreement which contained similar provisions regarding plan confirmation. The August 10 agreement included National Redevelopment Company (NRC), a partnership formed by Ericson and Bergman, as an additional party and provided for the development, leasing, and ownership of various shopping center projects through the formation of a separate limited partnership for each project.[6] That same day Ericson and Bergman entered into a limited partnership agreement for the purpose of acquiring a site for, developing, constructing, leasing, and operating the Sheboygan shopping center. By the terms of the agreement, the partnership, named Plaza Eight Mall (Plaza), consisted of Bergman as general partner and Ericson as limited partner.[7]

On October 15, 1979, approximately two weeks after EDC commenced Chapter XI proceedings, Plaza entered into a contract for the sale of real property at a price of $387,211. The contract terms delineated the obligations of the parties with respect to the development of the property and provided that the deed be delivered to Plaza by June 1, 1980. Fifteen percent of the sale price was paid upon execution of the contract, with the remainder to be paid simultaneously with the June 1 delivery of the deed. There is no indication on the record as to whether the remaining cash was ever paid or, if the deed was ever delivered pursuant to the contract.

On December 19, 1979, Bergman, NRC and Ericson entered into binding letter agreements offering 10% partnership interests in three partnerships, including Plaza, to Maxwell, Inc., and Loraine Company, two prospective limited partners. The letter agreements specifically provided that $250,000 of the full $750,000 investment requested from each would be allocated to

---

4. While the May 23, 1979, agreement makes explicit reference to expenses incurred to acquire options to purchase development sites, no evidence was ever submitted to the effect that either Ericson or EDC had acquired such an option with respect to Sheboygan as of this date. At best, it appears that EDC retained no more than the opportunity to negotiate exclusively with the city of Sheboygan concerning a final development agreement. A later limited partnership agreement specifically indicates that as of at least August 10, 1979, no site was acquired in Sheboygan.

5. Of some significance, and indicative of Ericson's intent at the time, the May 23 agreement was expressly conditioned upon approval of the Bankruptcy Court.

6. The August 10, 1979, agreement was amended on August 22 by an addendum to the agreement which was sent to Tom Lovett, Ericson's bankruptcy counsel. The August 22 addendum provided that all loans made or to be made by Bergman or the National Redevelopment Company under the partnership agreement were to be secured by all of the assets of Ericson and EDC. The agreement was amended a second time on October 4, 1979, by a letter agreement which served to alter certain terms of the earlier agreement including profit and loss ratio provisions.

7. The August 10, 1979, Plaza Eight Mall limited partnership agreement was amended in its entirety on October 4, 1979. The amending agreement added additional limited partners and altered the terms of the preceding agreement to an extent not herein relevant.

the Sheboygan shopping center. Two days later, by December 21, 1979, all parties to the preceding Plaza limited partnership agreement, as well as representatives of Maxwell and Loraine, had entered into a new limited partnership agreement to be effective January 10, 1980. While it is somewhat unclear from the face of the documents, Maxwell and Loraine apparently each funneled $250,000 into the Sheboygan project pursuant to the December 19 letter agreements. The record indicates that in exchange for the 10% partnership interests to the two new limited partners, Ericson's and Bergman's Allocated Capital Accounts under the partnership agreement were each credited with $250,000. Ericson was to receive such amount only if the Sheboygan project was ever built.

On February 25, 1980, counsel for both Maxwell and Loraine expressed his understanding that should the projects listed in the original December 19, 1979, letter not fully mature in three years, his clients' investments would be fully personally guaranteed by NRC, Bergman and Ericson. The February 25 letter was expressly acknowledged by NRC, Bergman, and Ericson, indicating their consent to such guarantee.

By May 20, 1980, general economic conditions forced EDC, Ericson, NRC, and Bergman to downscale their various developments to six projects, including the Sheboygan project. By written agreement on that date, Ericson and EDC were released from any commitment to work exclusively for the parties' mutual benefit. Moreover, NRC and Bergman were released from any obligation to help fund Ericson's and EDC's Chapter XI plan of arrangement. Pursuant to the agreement, the parties effectively divided their efforts such that Ericson and EDC alone were to utilize their best efforts to successfully develop certain projects, including the one in Sheboygan.

On August 14, 1980, Ericson, EDC, NRC, and Bergman further altered their relationship with respect to their remaining joint projects. The parties agreed at that time to exchange interests in various projects,

thereby reducing the number of projects pursued in partnership. As to the Sheboygan project, the partnership was retained. However, it was agreed that proceeds arising out of the dissolution of an unrelated project would be injected into Sheboygan. As a result of such, the limited partners Maxwell and Loraine were to each receive an additional 5% interest in the development, with corresponding reductions in interest on behalf of Ericson and Bergman.

Despite attempts throughout 1979 and much of 1980 to bring about a successful development of the Sheboygan project, no such development was ever achieved. The record indicates, however, that at all relevant times Ericson intended that proceeds derived therefrom would be utilized in funding an anticipated $3 million plan of arrangement. No such plan was ever confirmed. Neither Ericson nor EDC ever received any financial benefit from the Sheboygan project.

### C. *Indian Hills Shopping Center Development*

#### 1. *Chronology*

On December 14, 1978, Ericson executed a promissory note on behalf of EDC evidencing a promise by EDC to pay Pomona Valley Shopping Center Associates (Associates) $100,000 by February 28, 1979. The note, which was personally guaranteed by Ericson, was given by EDC in an effort to initiate a purchase of the Indian Hills Shopping Center located in Pomona, California. The shopping center was approximately twenty years old at the time and had deteriorated somewhat. The owners had apparently been seeking a purchaser for some time who would step in and redevelop the property. While Ericson had declined, as early as 1976, to pursue the development, by 1978 an EDC redevelopment appeared more attractive to all parties concerned.

On January 19, 1979, Associates sent Ericson a letter agreement providing in effect that the December 14 promissory note would constitute "consideration for entering into the binding purchase and sale

agreement as set forth herein in the manner referred to herein." The letter included certain terms and incorporated an earlier agreement which provided for a $3,250,000 sale price for the shopping center. Ericson executed the January 19 letter agreement on behalf of EDC shortly thereafter, thereby binding EDC at that time to purchase the subject property.

On February 22, 1979, prior to the February 28 due date on the promissory note, and with insufficient funds to meet that obligation, Ericson supplied Associates with a post-dated check in the amount of $100,000 with an understanding that Associates would surrender the note upon presentment and acceptance of such check. Ericson indicated in his February 22 letter, which accompanied the $100,000 check, that "[s]ince we are entering into a purchase and sale, I have eliminated all references to an option period and its accompanying restrictions." Furthermore, the purchasing entity had been changed from EDC to EBPC. The purpose behind the change in purchasing entities was stated to be for tax purposes only. By letter response to Ericson's February 22 correspondence, Associates indicated its consent to the change in purchasing entities conditioned upon both Ericson and EDC agreeing to guarantee the terms of the transaction on behalf of EBPC. Ericson and EDC did agree to guarantee such.

Shortly after the passage of the February 28 due date on the note with Associates, EDC managed to locate the necessary funding to back the post-dated check previously forwarded. On March 12, 1979, Ericson had signed a promissory note on behalf of EDC with another entity, American Income Properties, for a loan of $100,000 which was then applied to the note with Associates and treated as a $100,000 advance from EDC to EBPC. The American Income Properties loan was due three months hence and was guaranteed by Plaintiff Lands and another individual. In

exchange for the guarantee, Lands received an option to buy into the Indian Hills project.[8]

By April, 1979, EDC was again in need of funds—this time to meet its current operating expenses. In an effort to resolve its financial difficulties, EDC looked to EBPC for a repayment of advances totalling approximately $130,000, which included the $100,000 advance to cover the Indian Hills Shopping Center payment. EBPC, however, was apparently similarly financially situated. On April 30, 1979, EBPC entered into an agreement with Donald Bergman. Pursuant to the provisions of that agreement, Bergman advanced funds to EBPC to enable it to repay the amount owed to EDC. EBPC did in fact repay EDC sometime shortly thereafter—prior to the May 7 filing of Ericson's petition and schedules.

Specifically, the April 30 agreement provided that Bergman would advance funds toward the repayment of EDC and the development of the shopping center in an amount not to exceed $650,000. In exchange for these advances, Bergman was to receive a 50% interest in the shopping center as well as a mortgage on the remaining 50% to secure all advances made by him. The agreement further provided that the parties would form a limited partnership which partnership would be owned 50% by each and which would hold all rights, title and interest in and to the shopping center.

On May 15, 1979, eight days after Ericson commenced voluntary chapter XI proceedings and filed his bankruptcy schedules, EBPC and Bergman entered into a partnership in the name of Indian Hills Mall, Ltd. Associates (Indian Hills Mall). Pursuant to that agreement, as well as the April 30 agreement between the parties, EBPC and Bergman contributed all of their respective rights, titles, and interests in the Indian Hills shopping center into Indian

---

**8.** It may be that the transfer from EDC to EBPC of the Indian Hills interest included a transfer of Lands' option to buy into the project, or that Ericson's grant of an option to Lands was done on behalf of EBPC. A complete characterization of Lands' option is not possible from the trial record, nor is it necessary for my decision herein.

Hills Mall. Moreover, the partnership agreement provided for an allocation of profits to all partners in the following manner: (1) 50% to EBPC; (2) 5% to Bergman; and the remaining profits to the limited partners in accordance with their respective profit and loss ratios. Not long after entering into that agreement, the partnership entered into a purchase agreement with Associates, the original owners of the shopping center, to purchase the property for $3,250,000.

Subsequently, on June 12, 1979, Indian Hills Mall entered into a development agreement with EDC whereby EDC would undertake the development of the shopping center. Pursuant to the agreement, EDC was to and did receive a monthly development fee of $10,000. This fee was apparently paid up to and after the September 28, 1979, filing of EDC's bankruptcy petition.

As the redevelopment plans for the shopping center progressed, additional funding became necessary and was advanced by Bergman. By January 16, 1980, as a direct result of the substantial sums funneled by him into the project, Bergman sought and received a written grant of authority from EBPC. The agreement specifically provided that Bergman would have sole and complete authority to act on behalf of Indian Hills Mall in negotiating and executing all agreements and documents pertaining to the construction loan for the project. Five days later, on January 21, Bergman agreed to infuse substantial additional capital into the project in exchange for a reduction in EBPC's profit and loss ratio from 50% to 45% and a corresponding increase in Bergman's profit and loss ratio from 5% to 10%.[9]

Apparently in conjunction with EBPC's reduction in interest and in authority over financing matters, EDC received a corresponding increase in responsibility over the actual development. On January 21, 1980, EDC and Indian Hills Mall entered into a supervision agreement and a leasing agreement concerning the Pomona shopping center project. The supervision agreement provided that EDC would assist the partnership in the development and construction of the shopping center as well as in obtaining the requisite financing. Pursuant to the leasing agreement, EDC was employed as the partnership's exclusive agent for the initial leasing of the project. Each agreement provided for compensation to EDC in amounts equal to or exceeding $10,000 per month.

By February 14, 1980, Bergman had further increased his interest in the shopping center. As a result of prior transfers of limited partnership interests to Bergman and by virtue of all partners' consent to the transactions, Bergman had in fact succeeded in consolidating ownership of 55% of Indian Hills Mall in his name.[10] The remaining 45% remained in the name of EBPC. Moreover, the February 14 agreement additionally installed Bergman as the managing partner of the project in place of EBPC, with sole and complete power and authority to negotiate and enter into any and all agreements relating to the financing and construction of the development. By agreement dated April 26, 1980, the February 14 agreement was supplemented by irrevocably granting unto Bergland absolute authority to enter into all transac-

---

9. A February 1, 1980, memorandum from EDC legal counsel Jim Meunier to Ericson, which was attached to a memo concerning a possible sale of the development to another entity, discussed the distribution of excess cash to the Indian Hill Mall partners under the May 15, 1979, partnership agreement. Meunier indicated that distribution would be made in the following manner: first, to partners in repayment of any loans by partners; second, to partners in repayment of the money in their capital accounts; and third, to partners in accordance with their profit and loss ratios. Meunier estimated at this time that Bergman's loans to the partnership, which would be accorded priority status in distribution, totaled approximately $815,000. Evidence at trial established that the sale to the other entity never occurred.

10. It should be noted that 7.5% of the Indian Hills Mall, which figures has been included in Bergman's 55%, was actually held in joint tenancy with a second individual.

tions specified in the May 15, 1979, partnership agreement as well as to bind Indian Hills Mall in all contracts by his signature alone.

On May 8, several days subsequent to the April 26 agreement, Bergman accepted by letter an assignment tendered by EBPC of all of its rights, title, and interest in its remaining 45% interest in Indian Hills Mall. Bergman's letter explicitly provided that he would hold EBPC's 45% interest in trust for EBPC. The stated purpose of this assignment was to permit Bergman "the freedom and flexibility of unilateral negotiations" with respect to the shopping center development. On August 14, 1980, in exchange for forgiveness of all indebtedness of EBPC to Bergman, Indian Hills Mall, and the National Redevelopment Company, EBPC granted to Bergman only whatever remaining interest it had in the Indian Hills shopping center development. EBPC further released Bergman from his obligations to EBPC as trustee of such interest. Aside from certain development, supervisory, and leasing fees paid to EDC, neither Ericson, EDC, or EBPC ever realized a profit from their interests in the shopping center.

## 2. *Ericson's Nondisclosure of Indian Hills*

Both Ericson's and EDC's bankruptcy schedules omitted any reference whatsoever to the Indian Hills shopping center. In each case, the schedules were prepared at the request of the debtors by Mr. Thomas G. Lovett, who was at that time and continues to be experienced counsel in bankruptcy matters. The record indicates that approximately sixty percent of Mr. Lovett's practice is devoted to such concerns and that he regularly represents debtors, creditors, and creditor committees.

While it is unclear whether Mr. Lovett was in any way familiar with the Indian Hills shopping center prior to the preparation and filing of Ericson's individual bankruptcy schedules on May 7, 1979, he was at least minimally familiar with the development, as well as with the transfer of the option to the Indian Hills Mall partnership,

later that same month. At least by August 17, 1979, more than one month prior to the filing of EDC's bankruptcy schedules, Mr. Lovett was additionally aware to some extent of EBPC's role in the development. This awareness was substantially increased at least by January 1980 when Mr. Lovett received from EDC's in-house counsel a detailed account of the Lands-Ericson relationship and of the early stages of the various parties' involvement in the shopping center. There is no doubt but that by virtue of the January account received by Mr. Lovett and additional information subsequently received in February 1980, Mr. Lovett was integrally familiar with many of the circumstances surrounding the Indian Hills project by early 1980.

At no time, before or after the preparation and filing of Ericson's and EDC's schedules, did Mr. Lovett consider it necessary or appropriate to disclose Indian Hills as an asset or interest of either estate. While his knowledge, prior to the May 7, 1979, filing of Ericson's schedules, of the relevant facts is debatable, it is clear that no amendment was made or attempted once additional information later became available. Similarly, whatever his knowledge was before the September 28, 1979, filing of EDC's schedules, no attempt was made in that case to amend those schedules. As to Ericson's own intentions concerning the appropriate disclosure to be made in both his and EDC's bankruptcy, Ericson testified that based upon his own understanding and upon the advice of counsel he never considered the Indian Hills shopping center as an asset of either estate.

### DISCUSSION

Plaintiff objects to Defendant Ericson's discharge of indebtedness pursuant to various provisions of section 14(c) of the Bankruptcy Act. Plaintiff contends that Ericson

committed an offense punishable by imprisonment as provided under section 152 of Title 18 ... or ... at any time subsequent to the first day of the twelve

months immediately preceding the filing of the petition in bankruptcy, transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property with intent to hinder, delay, or defraud his creditors....

Bankruptcy Act, § 14(c)(1), (4), 11 U.S.C. § 32(c)(1), (4), *amended by* 11 U.S.C.A. § 727 (Supp.1985). As to offenses punishable by imprisonment under section 152 of Title 18, Plaintiff specifically alleges that Ericson:

(i) knowingly and fraudulently concealed from the officers of this Court charged with the control or custody of property and from creditors in this bankruptcy proceeding, property belonging to the estate of Ericson, and which should have been disclosed to this Court and to the creditors in this bankruptcy proceeding;

(ii) knowingly and fraudulently made false oath on account of and in relation to this bankruptcy proceeding;

(iii) in contemplation of this bankruptcy proceeding by him, or with intent to defeat the bankruptcy law, knowingly and fraudulently transferred and concealed property belonging to Ericson;

(iv) after filing of the above-entitled proceeding or in contemplation thereof, knowingly and fraudulently concealed and made false entries in documents affecting or relating to the property or affairs of a bankrupt; and

(v) after filing of the above-entitled bankruptcy proceeding, knowingly and fraudulently withheld from the officers of this Court, documents affecting or relating to his property or affairs.

*See* 18 U.S.C. § 152 (1982).[11] The factual basis for Plaintiff's objection to Ericson's discharge is grounded in the nondisclosure of the Sheboygan and Pomona shopping center projects as assets of both Ericson's and EDC's bankruptcy estates.

Whether or not the facts herein warrant a denial of Ericson's discharge depends upon the determination of the following issues: (a) Did the Sheboygan or Pomona shopping center projects, or any interest therein, constitute an interest in property that was required to be disclosed by Ericson and EDC; and (b) Was such nondisclosure of the project or an interest therein done with the requisite fraudulent intent contemplated by the applicable statutory provisions. Based upon the evidence submitted, I find that the facts herein do not warrant a denial of Ericson's discharge.

### A. *Burden of Proof*

■ As a preliminary matter, the parties' briefs raise questions concerning the proper burden of proof to be applied. Resolution of these questions requires an interpretation of section 14(c) of the Bankruptcy Act in the context of former Bankruptcy Rule 407 which is stated to supercede in part the statutory provision.

11. Section 152 provides in relevant part as follows:

> Whoever knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or from creditors in any case under title 11, any property belonging to the estate of a debtor; or
>
> Whoever knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11; or
>
> ....
>
> Whoever, either individually or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against him or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation; or

> Whoever, after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information, including books, documents, records, and papers, relating to the property or financial affairs of a debtor; or
>
> Whoever, after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court entitled to its possession, any recorded information, including books, documents, records, and papers, relating to the property or financial affairs of a debtor.
>
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.
>
> 18 U.S.C. § 152 (1982).

Section 14(c) contains in relevant part the following proviso concerning the burdens of proof to be borne by the parties:

> if, upon the hearing on an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which ... would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt.

Bankruptcy Act § 14(c), 11 U.S.C. § 32(c), *amended by* 11 U.S.C.A. § 727 (Supp.1985). This statutory language was interpreted by many courts to shift the ultimate burden of persuasion to the bankrupt upon a showing by the objector that there were reasonable grounds upon which to deny discharge under the subsection. 1A Collier on Bankruptcy ¶ 14.12 (14th ed. 1978) (*see* cases cited therein).

Subsequent to the enactment of the section 14(c) proviso, former Bankruptcy Rule 407 was adopted. That rule provides: "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection." Significantly, the Advisory Committee Note to Rule 407 explains the full import of this provision.

> The rule supersedes the proviso at the end of § 14c of the Act.
>
> . . . .
>
> This rule does not deal with the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion,

the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of such considerations as the difficulties of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the bankrupt than to the objector.

12 Collier on Bankruptcy ¶ 407.1 (14th ed. 1978). Several courts have interpreted Rule 407 in a manner consistent with the Advisory Committee Note as well as with the United States Supreme Court's rule making power under 28 U.S.C. § 2075.[12] *See e.g., Matter of Oesterle,* 651 F.2d 401, 403 (5th Cir.1981); *Matter of Decker,* 595 F.2d 185, 187–90 (3d Cir.1979); *Matter of Tucker,* 399 F.Supp. 660, 661–62 (S.D.Fla. 1975); *In re Vail,* 1 B.R. 132, 134 (Bktcy.E. D.Pa.1979); *Cf. In re Redfearn,* 29 B.R. 739, 740 (Bktcy.E.D.Tex.1983) (applying Rule 407 to 11 U.S.C. § 727); *Matter of Ackerman,* 16 B.R. 640, 642–45 (Bktcy.D. N.J.1981) (applying Rule 407 to section 17 of the Act); *Melichar v. Ost,* 7 B.R. 951, 961–64 (Bktcy.D.Md.1980) (applying Rule 407 to section 17 of the Act). *But see Matter of Freedman,* 693 F.2d 50 (8th Cir. 1982); *Gardner v. American Century Mortgage Investors,* 577 F.2d 928, 929 (5th Cir.1978).[13]

In *Freedman, supra,* the Eighth Circuit announced its most recent statement concerning the proper burden of proof under section 14(c) of the Act. In language substantially similar to that found in the section 14(c) proviso, and omitting any explicit

---

**12.** Section 2075 provides in relevant part as follows:

> The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure under the Bankruptcy Act.
>
> Such rules shall not abridge, enlarge, or modify any substantive rights.
>
> . . . .
>
> All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

28 U.S.C. § 2075 (1976), *amended by* 28 U.S.C. § 2075 (1982).

**13.** In *Gardner,* the Fifth Circuit applied the section 14(c) proviso of the Act subsequent to the adoption of Rule 407. No reference whatsoever was made to that rule however. This interpretation of the burden of proof under section 14(c) has caused one court to speculate that the bankruptcy proceedings in *Gardner* may have arisen prior to the effective date of the rule. *See Melichar v. Ost,* 7 B.R. 951, 963 n. 17 (Bkrtcy.D. Md.1980). In light of the Fifth Circuit's otherwise apparent subsequent reversal in its analysis, *see Matter of Oesterle,* 651 F.2d 401, 403 (5th Cir.1981) (directly applying Rule 407), I am inclined to agree with the *Ost* court's assessment.

reference to Rule 407, the court stated: "Under applicable law, once a creditor raises reasonable grounds to support a finding that the bankrupt committed any of the prescribed acts, the bankrupt has the burden of proving that he or she has not done so." *Freedman*, 693 F.2d at 51. The law, as stated in *Freedman*, in fact remains unaltered from the Eighth Circuit's earlier pronouncements which predated Rule 407, and provides in effect that upon the objector establishing a prima facie case, the burden of persuasion shifts to the bankrupt.[14] Although no Eighth Circuit decision appears to specifically address the effect of Rule 407 on section 14(c), I am constrained to follow the otherwise clear edict from the Court of Appeals. Therefore, in the present matter, Plaintiff must first establish a prima facie case. The burden of persuasion then shifts to Ericson to establish that he is entitled to a discharge. Regardless of who bears the burden of proof in this matter, though, I am satisfied that the facts, as presented, mandate a holding in favor of Ericson.

### B. Conclusions of Law Regarding Ericson's Nondisclosure of Sheboygan

■ During the trial, and after the close of Plaintiff's case, Ericson moved for involuntary dismissal of Plaintiff's complaint pursuant to Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b). The motion for involuntary dismissal was granted as to any nondisclosure of a Sheboygan shopping center interest. Pursuant to Bankruptcy Rules 7041 and 7052 and Federal Rules of Civil Procedure 41(b) and 52(a), my decision to grant such motion in part was based upon the following conclusions of law:

(1) Ericson lacked any interest whatsoever in the Sheboygan project until the Plaza Eight Mall limited partnership entered into a contract for sale of the Sheboygan property on October 15, 1979—subsequent to the filing of both Ericson's and EDC's bankruptcy petitions and schedules—and, therefore, had no interest in Sheboygan to disclose on his original schedules.

(2) To the extent that Ericson may have possessed an interest in the estate on or after October 15, 1979, by virtue of the contract for sale of the Sheboygan property, which thereby gave rise to the duty to amend either his or EDC's bankruptcy schedules, Ericson's failure to amend such schedules was not with the requisite fraudulent intent contemplated by 18 U.S.C. § 152 and section 14(c)(1) of the Bankruptcy Act or with the intent to hinder, delay, or defraud creditors pursuant to section 14(c)(4) of the Bankruptcy Act.[15]

---

**14.** The court in *Freedman* cites only section 14(c) and *In re Bateman*, 646 F.2d 1220, 1222–23 (8th Cir.1981), as supporting authority for its decision. Significantly, the *Bateman* decision cites and quotes a pre-Rule 407 Eighth Circuit decision as follows:

> The burden which shifts now upon a showing of reasonable grounds is not a burden of going forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged; the bankrupt now has the risk of ultimately persuading the court that the allegations in the specifications are untrue once the objector has shown that there are reasonable grounds for believing that the bankrupt has committed one or more of the acts enumerated in § 14c. If the evidence is in a state of substantial equilibrium, the discharge must be denied since the bankrupt has failed to carry his burden of proof.

*Bateman*, 646 F.2d at 1223 n. 4 (quoting *Shainman v. Shear's of Affton, Inc.*, 387 F.2d 33, 37 (8th Cir.1967) (quoting 1A Collier on Bankruptcy ¶ 14.12 which was subsequently amended to incorporate discussion concerning the purportedly superseding provision of Rule 407, *see* 1A Collier on Bankruptcy ¶ 14.12 (14th ed. 1978))). It may well be that counsel in both *Bateman* and *Shainman* failed to direct to the Eighth Circuit's attention the existence of Rule 407. I am hesitant to so conclude, however, and therefore presume the Court of Appeals had the opportunity to consider the applicability of the rule to section 14(c).

**15.** My conclusion that Ericson lacked the requisite intent contemplated under the statutory provisions is based upon all of the testimony and documentary evidence submitted in Plaintiff's case in chief, including: (a) the speculative nature and value of Ericson's interest in Sheboygan; (b) the fact that the Sheboygan project,

## C. *Ericson's Interest in the Pomona Shopping Center Project*

Plaintiff vigorously contends that by virtue of (1) a September 20, 1978, letter agreement granting Ericson on behalf of EDC a nonexclusive option to purchase the shopping center, and (2) a January 19, 1979, letter agreement to the effect that acceptance of the $100,000 promissory note submitted by EDC bound the respective parties to purchase and sell the center, Ericson received an interest in property which was required to be disclosed as an asset of Ericson's bankruptcy estate. While I am satisfied that the evidence supports the proposition that the two letter agreements conferred such an interest in the shopping center upon EDC, I cannot conclude that Ericson held any interest in the center at the time of the filing of his petition that would warrant any disclosure.

The record establishes that on approximately February 22, 1979, or shortly thereafter, the various parties reached an agreement whereby EBPC would be designated the purchasing entity. In essence, on or near that date EDC effectuated an assignment of its rights as the purchaser of the shopping center to EBPC. While Plaintiff contends that the transfer to EBPC was without consideration, this allegation lacks evidentiary support. In fact, by an agreement between EBPC and Donald Bergman dated April 30, 1979, Bergman agreed to advance funds to EBPC to enable it to repay amounts owed to EDC. Shortly after receiving such advance from Bergman on April 30, EBPC paid EDC $130,000, which amount included a full repayment of the $100,000 originally advanced by EDC to EBPC on the shopping center purchase. As of the May 7, 1979, filing of Ericson's bankruptcy schedules, as well as the Sep-tember 28, 1979, filing of EDC's schedules, neither Ericson nor EDC held any interest whatsoever in the Pomona shopping center.[16]

Significantly, Plaintiff's pleadings, as well as the trial record, are void of any allegation that the $100,000 ultimately received by EDC represented any less than fair market value for the shopping center interest transferred to EBPC. In fact, Plaintiff based his entire argument on the assertion that EDC received nothing in the exchange. Moreover, in light of the proximity in time of the respective transactions between (a) Associates and EDC and (b) EDC and EBPC, and the lack of other relevant circumstances, I am of the opinion that the second transaction—between EDC and EBPC—involved an equal exchange of value. The transfer to EBPC of the shopping center asset, standing alone, did not constitute a concealment of an asset of Ericson's bankruptcy estate.

Plaintiff argues that both EDC's and EBPC's corporate existence should be disregarded such that an interest held by either EDC or EBPC in the shopping center constitutes an interest held by Ericson individually. Support for this argument is grounded in part in the fact that EDC is 100% owned by Ericson. Plaintiff also directs my attention to testimony by Ericson to the effect that Ericson controlled the affairs of EBPC and that EBPC was Ericson's "nominee" and "alter ego". Based upon my determination above that the Pomona interest was transferred to EBPC for fair consideration, Plaintiff's "alter ego" theory enjoys at best only partial applicability.

Specifically, to the extent that Plaintiff seeks to employ an "alter ego" theory to

if successful, was intended to help fund Ericson's and EDC's plan of arrangement; (c) the fact that the Sheboygan project was disclosed to Ericson's bankruptcy counsel at least by August 10, 1979; (d) the lack of evidence as to whether there was actually ever a transfer of a deed pursuant to the October 15, 1979, contract for sale; (e) the fact that the project was never successful and that neither Ericson nor EDC ever realized any profit therefrom; and (f) the general absence of sufficient evidence to constitute a prima facie showing of intent.

16. At most, if the transfer of funds from EBPC to EDC had not occurred prior to May 7, 1979, EBPC would have owed a debt to EDC in an amount equal to the $100,000 advance. This, however, would not affect EDC's earlier assignment of its rights arising under the January 19, 1979, letter agreement to EBPC.

Ericson's nondisclosure of a Pomona shopping center interest ostensibly held by EDC, such need not be addressed herein. Whether or not EDC's corporate existence should be disregarded, it is clear that EDC held no shopping center interest which Ericson should have thereby disclosed. Moreover, Plaintiff does not contend, nor does the record suggest, that Ericson concealed or otherwise failed to disclose his 100% ownership interest in EDC as sole stockholder. Ericson's bankruptcy estate in fact included Ericson's entire interest in EDC as reflected in the value of EDC's entire issued and outstanding stock. In light of this, the value of the $100,000 received by EDC in the transfer of the shopping center interest to EBPC was disclosed by Ericson personally through his disclosure of his status as sole shareholder of EDC. Whether any "alter ego" theory should mandate a more specific disclosure of the $100,000 is not at issue in this proceeding.

As to whether EBPC's corporate existence should be disregarded, thereby treating EBPC's assets as those of Ericson personally, I hold it should not be disregarded. Both parties are in agreement that California and Minnesota law on this subject are similar. Both jurisdictions have adopted a two-pronged test which has been characterized by the Minnesota Supreme Court as follows:

> The first prong of the test focuses on the shareholder's relationship to the corporation. Eight factors we noted as significant in this determination include:

> > [I]nsufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

*Victoria Elevator Co. [v. Meriden Grain Co.]* 283 N.W.2d [509] at 512 [Minn.1979].

The second prong of the test examines the relationship of the plaintiff to the corporation. It requires the showing of "an element of injustice or fundamental unfairness." *Id.* To satisfy this portion of the test, "proof of strict common law fraud is not required, but, rather, evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented." *West Concord Conservation Club [v. Chilson ]*, 306 N.W.2d [893] at 898 n. 3 [Minn.1981].

*White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn.1982). *See Arnold v. Browne*, 27 Cal.App.3d 386, 394–95, 103 Cal.Rptr. 775, 781–82 (1972); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 837–40, 26 Cal.Rptr. 806, 813–15 (1962).[17]

17. Applying substantially the same two-pronged test as that found in *Jorgenson*, the California courts have listed the following factors as relevant to the application to the *alter ego* theory: commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue or subscribe to stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; the failure to adequately capitalize a corporation; the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between

Applying both prongs to EBPC,[18] I believe that Plaintiff has only managed to establish Ericson's pervasive control over that corporation. There remains insufficient evidence as to EBPC's failure to observe corporate formalities, nonpayment of dividends, insolvency, siphoning of funds, absence of corporate records and existence of the corporation as a facade. Aside from the fact that Ericson's influence over the affairs of EBPC, the record was similarly void of evidence concerning the nonfunctioning of EBPC's directors and officers. While it is true that, at the time EBPC was incorporated, one of Ericson's sons was still attending college, this fails to establish that such son was not properly functioning in his corporate capacity during the relevant time period. There is insufficient evidence, moreover, as to any injustice or unfairness.

In light of the above, I am satisfied that Ericson's testimony to the effect that EBPC was a shell corporation constitutes little more than his personal opinion as to the status of their relationship. At best, the evidence minimally supports only a determination that EBPC may have served as a shell corporation for EDC. Such, however, is insufficient to constitute a similar determination as between EBPC and Ericson personally. The record establishes that in fact no such shell corporation existed under the relevant case law.

As to any possible evidence concerning EBPC's undercapitalization, I am inclined to attach little probative value to such absent more substantial evidence to support disregarding EBPC's corporation existence. Plaintiff is not trying to pierce EBPC's corporate veil to reach Ericson's assets in the normal sense. Here Plaintiff seeks to establish that Ericson has in effect fun-neled assets to EBPC to deplete his bankruptcy estate and defraud his creditors. A showing of undercapitalization while the Pomona project was underway creates an inference that Ericson was not utilizing EBPC to defraud creditors. This inference directly conflicts with any additional inference concerning an identity of interest between Ericson and EDC, and perhaps highlights some of the inherent difficulty in applying a strict *alter ego* theory to the issue herein.

Plaintiff devotes substantial discussion to why EDC's corporate existence should be disregarded, specifically pointing to the transfer to EBPC as satisfying the "element of injustice or fundamental unfairness" test. As I have concluded that the transfer was for fair consideration, however, this aspect of Plaintiff's argument is particularly weak. I am further satisfied that the first prong of the test is insufficiently supported by the record as well. Regarding EDC, the record is substantially void of evidence indicative of any of the factors enumerated by the *Jorgenson* court. At best, Plaintiff has created a strong inference of insolvency of EDC in light of its nearly concurrent bankruptcy. This alone, however, is insufficient. To hold otherwise would cast every similarly situated bankrupt corporation outside the protective grasp of the Act, assuming the second prong of the test could be met. Such could not have been Congress' intent.

Particularly in light of the nonfraudulent nature of the transfer from EDC to EBPC in that it involved a transfer of the shopping center interest for fair consideration, I am satisfied that both EDC's and EBPC's corporate existence should not be disregarded. Therefore, Ericson lacked any individual interest whatsoever in the shop-

---

entities so as to concentrate the assets in one and the liabilities in another; the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity. *Arnold v. Browne,* 27 Cal.App.3d at 394–95, 103 Cal.Rptr. at 781–82 (citing *Associated Vendors* ).

18. Curiously, Plaintiff appears to construct his "alter ego" theory as to EBPC without addressing in any way just how the theory applies to a *non* -principal of a corporation. Ericson was not a shareholder, director, or officer of EBPC. He lacked any claim or right to assets or profits of that corporation. At best, Ericson might be considered a defacto officer by virtue of the control which he asserted over EBPC.

**110**

ping center that would have required disclosure in his bankruptcy schedules.

### D. *Fraudulent Intent*

In light of my determination above that Ericson lacked any interest in the Pomona shopping center that would be required to be disclosed on his bankruptcy schedules, there is no need to address whether any such nondisclosure was done with the requisite fraudulent intent.

IT IS THEREFORE HEREBY ORDERED that Plaintiff's objection to Ericson's discharge is denied.