VICTORIA ELEVATOR COMPANY OF MINNEAPOLIS and Victoria Grain Company of Minneapolis, as assignee and successor in interest to Victoria Elevator Company of Minneapolis, Respondents,

v.

MERIDEN GRAIN CO., INC., et al., Defendants,

Harold D. Schroeder, Appellant.

No. 49015.

Supreme Court of Minnesota.

Aug. 3, 1979.

Rehearing Denied Oct. 10, 1979.

Baudler, Baudler & Maus and William J. Baudler, Austin, Reitz, Reitz & Reitz, Owatonna, for appellant.

Berg, Hacking & Berg and John F. Hacking, Minneapolis, for respondents.

Heard before ROGOSHESKE, YETKA, and MAXWELL, JJ., and considered and decided by the court en banc.

YETKA, Justice.

This is an appeal by defendant Harold D. Schroeder from judgment entered pursuant to an order of the Steele County District Court, finding defendant individually liable for a default judgment previously entered against Meriden Grain Co., Inc., for breach of contracts with Victoria Elevator Company, assignor and predecessor in interest of plaintiff Victoria Grain Company.[1] We affirm the trial court.

Defendant Harold Schroeder was a farmer until 1959, when he went into business selling feed, seed, and other farm-related products under the name of "Schroeder's Cashway,"[2] at Meriden, Minnesota. In the fall of 1969, defendant and two others, Gerald Robinson and Paul Soli, entered into an agreement to form a corporation called Meriden Grain Co., Inc. Under the agree-

---

1. The original action was brought in 1974 by Victoria Elevator Co. against Meriden Grain Co., Inc. and Harold Schroeder. Meriden did not file an answer and a default judgment was entered against it on August 8, 1974. Victoria Elevator Company was dissolved in July 1974, and the causes of action against Meriden and Schroeder were among the assets sold to its successor, Victoria Grain Co. These two companies will be referred to collectively as "plaintiff."

2. Although defendant testified that this was a partnership between himself and his wife, there is no evidence of a partnership agreement, and it appears the business was treated, for tax purposes, as a sole proprietorship. In 1965, the name was changed to Schroeder's Cashway Grain; in 1969, it was changed to Meriden Farm Center.

ment, defendant was to transfer assets then held by Schroeder Cashway (net value stated at $49,520.10) to the new corporation and was to receive in return 495 shares ($100 per share) of the corporation. The other two were each to buy 165 shares of the corporation at $202 per share, each contributing capital of $33,330. Defendant prepared a bill of sale and a warranty deed transferring machinery and equipment and land and buildings to the corporation. Neither document was executed or delivered, and both were eventually voided.[3] Robinson and Soli never contributed any capital to the corporation and no shares were ever issued to them. In 1970, defendant and his wife were issued 250 shares of the corporation. Defendant testified that they gave cash and inventory worth about $40,000 for these shares. Corporate bank records indicate cash contributions totaling $25,564.56; however, there is no evidence of any document transferring machinery or equipment to the corporation.

The land on which the storage bins and other facilities used in conducting the business are situated was never transferred to the corporation. The only real property ever owned by the corporation was one bin and one grain leg—both built in 1972. All other property used by the corporation to conduct business was owned by defendant or defendant and his wife. Defendant never charged and the corporation never paid any rent for the use of these facilities.

Although the corporation did not own the land or the buildings on it, this property was listed as an asset of the corporation on financial statements submitted to the Credit Commodity Corporation (CCC) in 1970–1973 for the purpose of entering into agreements to store grain owned by the CCC. It was also listed as an asset on the balance sheet submitted with the corporation's 1972 federal income tax return. The corporation took deductions for depreciation,[4] taxes,

and insurance on this property on its 1971 and 1972 tax returns. This "error" was corrected on the tax return for 1973 (prepared in March 1974, after the corporation had ceased doing business). Defendant testified that the corporation never paid any taxes on the property.

The trial court found, and defendant does not dispute, that the corporation made misrepresentations in applications filed with the Minnesota Public Service Commission by implying that it owned storage facilities that it did not own.

Between November 1972 and July 1973, plaintiff entered into a series of 14 contracts with the corporation for purchase of corn, to be delivered to plaintiff between May and November 1973. The corporation partially performed one of these contracts and failed to perform any of the remaining contracts. When, in the fall of 1973, a dispute arose between plaintiff and defendant regarding this failure to perform, the parties held two meetings at which defendant, on behalf of the corporation, promised to deliver the remaining grain, and plaintiff tendered payment of $28,000 it had been holding because of the delays in performance. The contracts were not performed, and eventually plaintiff sued the corporation for breach of the contracts, recovering a default judgment for $391,395.59 (entered August 8, 1974).

In December 1973 the corporation stopped buying and selling cash grain. At special meetings of the stockholders and board of directors in September and November 1974, transfers of the grain leg and storage bin to defendant and his wife and to Meriden Farm Center, respectively, were approved. There is no evidence that the corporation has been dissolved, but there are no corporate assets from which to satisfy plaintiff's judgment.

3. The minutes of a special meeting of the board of directors of the corporation held on October 14, 1970, state that "now all property, land and equipment all goes back to the original ownership of Harold D. Schroeder now doing business as Meriden Farm Center * * *."

4. The depreciation statement included with the tax returns also listed certain equipment as depreciable assets. As noted previously, there are no documents indicating that any of this personal property was actually transferred to the corporation.

The trial court's findings of fact are supported by the evidence. The sole issue on appeal is whether, absent a showing that plaintiff was misled by or relied on defendant's practices, plaintiff can recover from defendant individually.

Although we have previously relied on findings that the corporate form was used to accomplish a fraudulent purpose to impose personal liability, we have never explicitly held that fraud is a necessary element.[5] As noted recently by the Fourth Circuit Court of Appeals, fraud may often be cited as a ground for disregarding the corporate entity, but it is not the only ground for such a finding. Courts have also relied upon the "alter ego" or "instrumentality" theory to impose liability on an individual shareholder. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 684, 685 (4 Cir. 1976). In their application of this theory, "courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." 540 F.2d 685. Factors considered significant in the determination include: insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation

as merely facade for individual dealings. 540 F.2d 685–86.

■ Disregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness. 540 F.2d 687. Where the above factors are present, to allow an individual to escape liability because he does his business under a corporate form is to allow him an advantage he does not deserve. Doing business in a corporate form in order to limit individual liability is not wrong; it is, in fact, one purpose for incorporating. But where the formalities of corporate existence are disregarded by one seeking to use it, corporate existence cannot be allowed to shield the individual from liability for damages incurred by those dealing with the corporation.

■ In the instant case, we have an individual who did not clearly distinguish between property owned by himself as an individual and property owned by the corporation. He combined the tax returns of the corporation and his sole proprietorship, using the wrong forms for both. He allowed the corporation to take deductions for depreciation on property not owned by the corporation. The corporation paid no rent for its use of property owned by defendant as an individual. He misrepresented corporate assets to state and federal agencies.[6] Defendant withdrew funds (al-

5. In *Ahlm v. Rooney,* 274 Minn. 259, 143 N.W.2d 65 (1966), we refused to disregard the corporate entity where there was no evidence that the method of financing corporate operations was used to deplete the corporation's assets by bargain sale or otherwise and there was no evidence that individual defendants intermingled personal funds with corporate funds so as to misrepresent its true financial capacity. In the absence of such evidence, no inference of fraud could be drawn that would justify holding the sole two stockholders personally liable. We did not say, however, that such an inference was the *only* ground for holding stockholders personally liable. In that case, the plaintiff had not provided any other facts upon which such a holding might be based. His argument for holding the stockholders personally liable had been based only on the finan-

cial operations and on the fact that there were only two stockholders. Moreover, the defendants in that case observed the formalities of a separate corporate existence more closely than has the defendant in the instant case.

6. Plaintiff checked with the Minnesota Public Service Commission in late 1972 or early 1973 and found that the corporation was licensed and bonded to do business as a country grain elevator. The licensing and bonding requirements of Minn.St. 232.02, .13, are intended to protect the owners of grain stored with elevators rather than the buyers. Nevertheless, defendant should not escape liability because plaintiff is not within the class specifically protected by the statute.

legedly as wages) from the corporation at a time when the corporation was in financial trouble.[7]

Other facts of defendant's conduct also support finding him individually liable. Although the defendant observed corporate formality by holding shareholders' and directors' meetings and issuing stock certificates, he failed to make formal distinctions between corporate and individual property. There are no documents clearly indicating transfer of individual property to the corporation. Even the cash contributions to the corporation were not clearly marked. The corporation paid no dividends. Only defendant managed the corporation; voting at meetings by defendant and his wife was apparently a mere formality.

It is clear from the evidence in this case that defendant did not treat the corporation as a separate entity. He lent it the use of his money and property—sometimes calling it a loan, sometimes calling it a transfer of assets, rarely making a formal record of the transaction. In a letter to the CCC in November 1969, he stated that the business had incorporated and was going under a new name: "Meriden is run the same as before and everything is the same as before except name only. P. S. We have just transferred our assets over to Meriden Grain so there should be no problem." This letter seems to suggest that defendant thought only the name had changed.[8] His method of filing his tax returns and of moving money in and out of the two businesses indicates that he did not differentiate between the sole proprietorship and the corporation. Since defendant did not treat the corporation as a separate legal entity, he should not be entitled to its protection against personal liability.

The trial court is affirmed.

TODD, J., took no part in the consideration or decision of this case.

---

7. On May 31, 1973, defendant drew a check upon the corporation's account for $39,997. The check was marked as payment of wages for October 1970 through July 1, 1973, plus interest. This amount is not shown as wages or salary on defendant's individual income tax return for 1973, nor is it shown on the corporation's 1973 tax return as salary paid out. Defendant testified that he did not show this as income "[b]ecause Meriden Grain Company Incorporated lost, we lost far more than what this check would amount to."

The corporation's balance sheet for the close of 1973 indicates a deficit of $26,662; the balance sheet for 1972 indicates assets of $130,904 —of which about $60,000 were assets actually owned by defendant as an individual. On Schedule L of Form 1120, 1973 corporate income tax return, the balance sheet shows as liabilities for the beginning of the taxable year loans from stockholders in the amount of $30,-232 and long term debts of $73,000. Neither of these is shown on the end of the year balance sheet. There is no evidence indicating how these debts were paid.

8. In a financial statement submitted to the CCC (signed March 21, 1972, by defendant as president of the corporation), the following statement appears: "Reason this statement is different is that we put the fertilizer plant & equip all under Meriden Grain Co. as we were sole owners of both corporations and running it all under one corporation now." The March 1971 balance sheet (apparently cash grain business only) shows $236,424.06 assets and liabilities (including $38,145.68 loan from defendant and $49,500 in capital stock). The March 1972 balance sheet (including both businesses) shows $369,085.80 in assets and $117,785 in liabilities. It does not include either the loan from defendant or capital stock.

This type of mingling of corporate and noncorporate funds would certainly constitute fraud as regards the dealings with the CCC. It is also evidence of defendant's failure to observe the separate legal and financial existence of the corporation.