ASSOCIATION OF MILL AND ELE-
VATOR MUTUAL INSURANCE
CO., et al., Respondents,

v.

BARZEN INTERNATIONAL,
INC., Defendant,

Weber–Stephen Products Co., Appellant.

No. C2–96–323.

Court of Appeals of Minnesota.

Sept. 17, 1996.

Review Denied Nov. 20, 1996.

Thomas Fraser, Cynthia Jokela, Fredrikson & Byron, P.A., Minneapolis, for Appellant.

Robert J. Tennessen, O'Connor & Hannan, Minneapolis; Anne Meredith–Will, Meredith–Will Law Office, Bemidji, for Respondents.

Considered and decided by KLAPHAKE, P.J., and KALITOWSKI and WILLIS, JJ.

## OPINION

KLAPHAKE, Judge.

Respondents, 25 unsecured trade creditors, brought this action against appellant Weber–Stephen Products Company (Weber) and its wholly-owned subsidiary, Barzen International, Inc (Barzen). They obtained a default judgment against Barzen and an uncontested summary judgment as to the amount of damages against Weber. The is-

sue of liability was tried to the court on the theories of piercing the corporate veil, agency, promissory estoppel, and breach of fiduciary duty. The court disregarded Barzen's corporate entity and found Weber liable for Barzen's debts to respondents. The court similarly concluded that Weber had breached a fiduciary duty to respondents. It found no factual basis for establishing liability under the legal theories of agency or promissory estoppel.

On appeal, Weber seeks reversal of the trial court's decision to disregard Barzen's corporate entity and its conclusion that Weber breached a fiduciary duty to respondents. Alternatively, Weber requests a new trial on claimed procedural irregularities.[1] Respondents seek reversal of the trial court's decision on the promissory estoppel claim. Because we conclude that the record does not support piercing Barzen's corporate veil or finding a breach of fiduciary duty, we reverse those decisions. We affirm the trial court's decision on promissory estoppel.

## FACTS

This action arises out of the May 1990 closing of Barzen, headquartered in Stacy, Minnesota. Barzen had been in business for 40 years as a bird and grass seed manufacturer before it closed its doors. Five years earlier, in November 1985, Weber, a closely-held Illinois corporation, had purchased all of Barzen's stock.

### A. *Barzen Before the Weber Purchase*

Two years before Weber purchased Barzen, Barzen's physical plant was destroyed by fire. When it reopened, it had severe financial difficulties. By the time Weber purchased Barzen, Barzen owed $1,364,894 to 105 creditors. Weber's purchase of Barzen was made contingent on Barzen's unsecured creditors' agreement to a payment plan.

### B. *After the Weber Purchase*

At the November 19, 1985 closing, Weber made a $200,000 capital contribution to Barzen in exchange for all of Barzen's voting stock. After the closing, Barzen's net equity was $32,000.

Barzen continued to operate its Stacy plant. Barzen management continued running the company's day-to-day operations. Larry E. Wogensen, Sr. continued on as Barzen's President and Chief Operating Officer under a three-year employment agreement. Wogensen reported directly to Weber's Vice President, Secretary, and Treasurer, Leonard Gryn, and the Weber Executive Committee. Barzen's Controller, Norma Belland, also continued managing Barzen finances, including payroll, accounts payable, accounts receivable, and daily banking.

Weber arranged for a line of credit to Barzen from Continental Bank. Barzen was authorized to draw on the credit up to $3.5 million without obtaining permission from Weber. Continental Bank took a security interest in Barzen's assets, and Weber signed a guarantee.

Barzen followed the same corporate formalities as it did before the Weber purchase. It kept its own corporate records and bank accounts, obtained legal counsel, had its own officers, filed Minnesota tax returns, and issued its own shares. Barzen owned and leased property in its own name, negotiated for and bought raw materials, produced its own products, and sold them at prices it determined. Barzen also maintained its personnel and sales distribution system substantially independent of Weber.

While under Weber's ownership, Barzen's sales increased substantially. Notwithstanding Weber's annual infusion of cash (in the amount of its tax benefits from owning Barzen) and provision of equipment and management services (uncompensated), Barzen's expenses also increased dramatically, resulting in a net loss each year. Within a few months of the Weber purchase, Barzen had, and then maintained, a net negative equity until it closed. Due to the Continental Bank line of credit, however, Barzen continued to pay its

---

**1.** Based on our holdings on the corporate piercing and breach of fiduciary duty claims, we need not reach this alternative basis for relief.

bills as they became due until December 1989.

### C. *Weber's Decision to Close Barzen*

Due to Barzen's performance, in 1988 Weber considered selling Barzen. It remained open through 1989, however, with Weber's Andrew Anderson taking a more active role in Barzen's plant management. By late 1989, Weber's officers instructed Barzen not to pay major bills without Weber's approval.

On February 19, 1990, the Weber Board of Directors decided to close Barzen and liquidate assets if a buyer could not be found. Having failed to find a buyer, on May 11, 1990, the board announced to Barzen's creditors its decision to close. With Continental Bank's permission, Barzen took steps to ensure that the debt to each creditor did not rise above the amount owed to it as of February 19, 1990, and that no unsecured creditor was preferred over another. Barzen closed on May 26, 1990. It owed approximately $1.6 million to 178 creditors.

Other than payments to keep each creditor at its February 19, 1990 level, all proceeds from the liquidation of Barzen assets went to Continental Bank pursuant to its perfected security interest. As guarantor on the Continental Bank line of credit, Weber was left owing $560,000. Respondents, all unsecured trade creditors, were left with $825,593 in unpaid bills.[2]

### ISSUES

I. Did the Barzen–Weber relationship support disregarding Barzen's corporate entity?

II. Did Weber owe Barzen's unsecured trade creditors a fiduciary duty and, if so, did it breach that duty?

III. Did the trial court erroneously conclude that respondents' promissory estoppel claim was barred by the statute of frauds?

### ANALYSIS

#### I. Piercing the Corporate Veil

Generally, absent fraud or bad faith, a corporation will not be held liable for the acts of its subsidiaries. There is a presumption of separateness the plaintiff must overcome to establish liability by showing that the parent is employing the subsidiary to perpetrate a fraud and that this was the proximate cause of the plaintiff's injury. * * * The main point is that, although corporations are related, there can be no piercing of the veil without a showing of improper conduct.

1 Charles R.P. Keating & Gail O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 43, at 729 (rev. ed. 1990) (footnotes omitted); *see United States v. Advance Machine Co.*, 547 F.Supp. 1085, 1093 (D.Minn.1982) (presumption of separateness); *Busch v. Mann*, 397 N.W.2d 391, 395 (Minn. App.1986) (subsidiary's separateness presumed absent showing that it is instrumentality or alter ego of parent).

For purposes of disregarding the corporate entity, Minnesota case law has not tailored factors to assess the relationship between a parent and its subsidiary. The seminal Minnesota case, *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509 (Minn.1979), involved a sole shareholder who set up and then disregarded a corporate entity, so that he was held personally liable for the corporation's debt. Despite the clearly distinct features inherent in the parent-subsidiary relationship, we believe the general principles of *Victoria Elevator* apply in this context as well. *Compare id.* (setting out factors for holding sole shareholder liable for corporate debt) *with Advance Machine*, 547 F.Supp. at 1093 (setting out factors for holding parent liable for subsidiary's debt).

■ Under *Victoria Elevator*, there first must be "a number of" the following factors:

[I]nsufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors,

---

2. The 25 respondents represent about one-half of Barzen's unsecured debt at the time it closed.

absence of corporate records, and existence of corporation as merely facade for individual dealings.

283 N.W.2d at 512 (citation omitted). There must also be an element of injustice or fundamental unfairness before a court will pierce the corporate veil. *Id.*

■ With regard to the first prong factors, the trial court found that Barzen observed corporate formalities, kept its own corporate records, and did not operate as a facade for Weber. The court also specifically found that Barzen was not Weber's alter ego and did not operate as Weber's mere instrumentality. The court found that Weber did not siphon funds from Barzen or receive dividends from Barzen. Weber's level of involvement was "typical" of many parent-subsidiary relationships.

The trial court also found insufficient capitalization, insolvency at the time the debts were incurred, and inhibited functioning of Barzen's corporate officers. These factors alone or in tandem, however, do not require piercing Barzen's corporate veil. First, Weber infused Barzen with capital from time to time. Its primary method, however, was to guarantee the Continental Bank line of credit. Given Barzen's condition at the time of the Weber purchase and its optimistic outlook and predictions for future performance, there was no indication that this type or level of capitalization would necessarily be insufficient. Second, there is no question that Barzen became insolvent and that some debt was incurred during insolvency. The presence of insolvency before a corporate closing, however, is too common to give the factor much weight in this context. *See, e.g., Snyder Elec. Co. v. Fleming,* 305 N.W.2d 863, 867 (Minn.1981) (corporation became insolvent and closed two years later); *B & S Rigging & Erection, Inc. v. Wydella,* 353 N.W.2d 163, 166 (Minn.App.1984) (insolvency for two months before ceasing operations). Third, as Barzen's performance failed to improve, Weber became more involved in its operations and decisionmaking. The "inhibited" or decreased functioning of Barzen's officers did not occur until late 1988, as Barzen's financial outlook worsened. This increase in control by the parent constitutes a reasonable reaction of a parent to its failing subsidiary. Weber's control, however, never constituted domination of Barzen's corporate functions.

Notwithstanding these indicia of separateness, the trial court pierced Barzen's corporate veil. The primary basis for the court's decision to pierce was a perceived unfairness to Barzen's unsecured trade creditors resulting from Weber's decision to close Barzen and subsequently pay down the Continental Bank line of credit. The court reasoned that paying down the line of credit benefitted Weber as guarantor by reducing the balance it would owe "while leaving the trade creditors unsecured and suffering the loss from the failure of Weber's investment."

With regard to the second prong of the *Victoria Elevator* analysis, we agree with Weber that there is no inherent unfairness in its "paying down" the Continental Bank line of credit during Barzen's liquidation. *Cf. Williams Plaza, Inc. v. Sedgefield Sportswear Div. of Blue Bell, Inc.,* 164 Ga.App. 720, 297 S.E.2d 342, 344–45 (1982) (absent misuse or misappropriation of funds, paying proceeds to secured bank and leaving nothing for unsecured creditors not basis for disregarding subsidiary's corporate entity). Respondents do not argue that the initial decision to obtain the line of credit was improper. They focus their complaint on Weber's actions after its decision to close Barzen. Those actions, however, were largely governed by Weber and Barzen's legal obligations to all of Barzen's creditors, secured and unsecured. Continental Bank, as a secured creditor, was in a priority position to Weber as guarantor and to respondents as unsecured trade creditors. Despite respondents' low priority, Weber nevertheless acted to freeze the amount of their liability as of the date Weber knew Barzen would either close or be sold. Consequently, Weber's actions were consistent with its legal obligations, and we reverse the trial court's determination of unfairness.

In conclusion, the facts do not rebut the presumption of corporate separateness in this case. Most of the *Victoria Elevator* factors reflect this separateness, and none of these factors, alone or jointly, support pierc-

ing. There is no evidence that Barzen was a sham operation or operating solely as Weber's instrumentality. Weber violated neither the law nor public policy in giving Barzen another chance to rebound from its financial difficulties. Absent sufficient facts supporting piercing, we reverse the conclusion to disregard Barzen's corporate entity. *See Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 354 (1977) (no deference to legal conclusion if it lacks support in facts).

## II. Breach of Fiduciary Duty

■■■ It is well established that, as fiduciaries to the corporation's creditors, the officers and directors of an insolvent corporation cannot approve

a transfer or encumbrance of corporate assets * * *, the effect of which is to enable the director or officer to recover a greater percentage of his debt than general creditors of the corporation with otherwise *similarly secured* interests.

*Snyder Electric*, 305 N.W.2d at 869 (emphasis added). The *Snyder Electric* holding expressly applies to corporate officers and directors. Nevertheless, the trial court concluded that Weber, Barzen's sole shareholder, owed a fiduciary duty to Barzen's unsecured trade creditors. In no case has the *Snyder Electric* holding been extended to create a shareholder's fiduciary duty to creditors based solely on its status as shareholder. *See, e.g., Honn v. Coin & Stamp Gallery, Inc.*, 407 N.W.2d 419, 422 (Minn.App.1987), *review denied* (Minn. Aug. 12, 1987); *B & S Rigging*, 353 N.W.2d at 168–69; *see also Groves v. Dakota Printing Servs., Inc.* 371 N.W.2d 59, 62 (Minn.App. 1985) (general rule is limited liability of shareholders). Therefore, we decline to extend the duty to Weber in this case.

■■■ Had there been a basis for holding Weber to the fiduciary duty of an officer or director of Barzen, however, the evidence does not establish a breach of that duty. Weber did not treat itself to a preference over respondents. No preference is created when, as here, security is given contemporaneously with a loan, the proceeds are used in good faith to pay debts, and, upon liquidation, payments are made to secured creditors. *See Snyder Electric*, 305 N.W.2d at

869. Paying down the secured Continental Bank line of credit during liquidation did not create a preference or constitute a breach of fiduciary duty to the unsecured creditors. Therefore, we reverse the trial court's conclusion that Weber breached a fiduciary duty to respondents.

## III. Promissory Estoppel

■■■ Generally, oral promises to pay the debts of third parties are unenforceable. Minn.Stat. § 513.01(2) (1982).

When the leading purpose of the promisor is to further his own interests, rather than merely to accommodate the debtor, [however,] the promise is enforceable despite the statute of frauds.

*Mitchell Feed & Seed, Inc. v. Mitchell*, 413 N.W.2d 847, 849 (Minn.App.1987). The trier of fact is in the best position to judge whether oral promises were made, what the mutual understanding of the parties was, and whether the promissor's benefits were merely incidental. *See id.* at 849–50.

Here, some respondents alleged oral guaranties of payment by Weber, which Weber denied making. No written evidence supported respondents' allegations. In its analysis, the trial court specifically analogized Weber's alleged promises "to stand behind" Barzen with those made in *Mitchell*. As mere collateral promises to accommodate Barzen, the trial court concluded they were unenforceable. Consequently, we see no basis to interfere with the trial court's decision on respondents' promissory estoppel claim.

## DECISION

The trial court erred in finding Weber liable by piercing Barzen's corporate veil or by a breach of a fiduciary duty to respondents. Its decision that respondents failed to establish promissory estoppel was supported by the facts and not clearly erroneous.

**Affirmed in part and reversed in part.**