**In re INTELEFILM CORPORATION, Debtor.**

**No. 02–32788.**

United States Bankruptcy Court, D. Minnesota.

Nov. 10, 2003.

Michael L. Meyer, Ravich Meyer Kirkman McGrath & Nauman, Minneapolis, MN, for Debtor.

### ORDER SUSTAINING DEBTOR'S OBJECTION TO CLAIM OF RON HOFFMAN (CLAIM NO. 55)

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the Court for hearing on the Debtor's objection to the claim of Ron Hoffman, filed as claim no. 55. The Debtor appeared by its attorney, Will R. Tansey. Hoffman appeared by his attorney, William P. Wassweiler. Upon the objection, Hoffman's response, and the arguments of counsel, the Court took the matter under advisement on an identified threshold issue. This order memorializes the decision on that issue.

### PROCEEDING AT BAR

The Debtor is a Minnesota corporation. After its formation, the Debtor engaged in radio broadcasting oriented toward a juvenile audience, under the name of Children's Broadcasting Corporation; later it switched its operations to the production of television commercials through several subsidiary corporations. On August 5, 2002, it filed a voluntary petition for reorganization under Chapter 11. It obtained

confirmation of a plan of liquidation on April 22, 2003.

On November 25, 2002, Hoffman filed a proof of claim in this case, acting through a Sherman Oaks, California attorney. The proof of claim was assigned no. 55 on the clerk's claims register. As his "Basis for Claim," Hoffman recited "Judgment," which he described as having been obtained on July 30, 2001. He recited the amount of his claim as "$310,212 plus 10% interest from July 30, 2001."

Hoffman attached two documents to his proof of claim. The first was a copy of a document entitled "Judgment After Trial by Court," as entered in the Los Angeles County, California Superior Court on July 30, 2001, with associated clerk's notices from the issuing court and from the Minnesota State District Court for the Tenth Judicial District, Anoka County.[1] All of these documents identified the liable defendants as "Harmony Pictures, Inc. and Harmony Holdings, Inc." The second attachment was a terse, unsigned, typed writing, as follows:

> Creditor is informed that Harmony Holdings, Inc. was purchased by Intelefilm [sic] Corporation as a wholly owned company and its name was charged [sic] to Harmony Acquisition Corporation.

The Debtor has objected to the allowance of this claim. It requests that the claim be disallowed in its entirety, or alternatively allowed in a reduced amount. As its primary ground for objection, the Debtor stated that "the underlying judgment is against entities other than Debtor and is unenforceable against Debtor."[2] Hoffman responded to the objection.

## PROCEDURAL POSTURE

At the initial hearing on its objection, the Debtor relied on its primary theory. The Debtor observed that Hoffman makes his claim in this case solely on the basis of the liability that was reduced to judgment in the Los Angeles County Superior Court. As the Debtor notes, it was not a party-defendant to Hoffman's California lawsuit, and it was not mentioned in the California court's judgment. Hoffman made no statement on the face of his proof of claim that the Debtor was liable on account of this judgment, and he recited no factual or legal basis for fixing such liability. Thus, the Debtor argued, there was no apparent basis on which to make the judgment-evidenced claim "[ ]enforceable against the [D]ebtor and property of the [D]ebtor," 11 U.S.C. § 502(b)(1), and Hoffman had no claim allowable in this case.

This cast the issue initially as one of law, raised by the Debtor on the facial content of Hoffman's proof of claim.

Hoffman's response was jointly verified by himself and his California litigation counsel. In it, he asserted:

> Based on facts discovered thus far, the Debtor treated Harmony Holdings as its alter ego and is therefore liable for its debts.

Hoffman then cited several circumstances and made a couple of additional fact assertions, to support his position that

> ... adherence to the fiction of the separate existence of Debtor and Harmony Holdings as separate entities from 1997 to the present, would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

---

1. The latter clerk's notice was issued pursuant to the Uniform Enforcement of Foreign Judgments Act.

2. The stated ground for the Debtor's alternate theory, "that the amount of judgment has been reduced on appeal," is not germane to the issue at bar.

Hoffman appeared to be arguing that evidence then available would support his theory to affix liability in the Debtor, by piercing the corporate veil. This would posit the Debtor's claim objection for an evidentiary hearing and a fact-finding process.

In reply, the Debtor denied that Hoffman was able to prove one of the two requirements for a piercing of the corporate veil. The Debtor's counsel did not frame it in so many words, but the gist of his argument is that the extant evidence contains no proof that logically goes to the challenged element; thus, as the Debtor would have it, Hoffman's theory of liability is ripe for adjudication "as a matter of law," adversely to Hoffman.

This, of course, is the analytic framework for summary judgment under Fed. R.Civ.P. 56,[3] as envisioned by the Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This procedure is applicable to the matter at bar. Fed. R. Bankr.P. 9014.[4]

As outlined by the Debtor's reply, this is the inquiry before the Court.

## BASIC, AND UNDISPUTED, FACTS

The Debtor relies on a handful of documentary and transactional facts. Some of them are set forth in judicial decisions in Hoffman's lawsuit in the California state courts,[5] and all of them are gleaned from Hoffman's response:

1. At various times between 1987 and 1993, Hoffman was employed by Harmony Pictures, Inc. in several capacities. In the early 1990s, Harmony Holdings, Inc. acquired all of the outstanding shares of Harmony Pictures.

2. On August 5, 1997, Harmony Pictures terminated Hoffman's employment.

3. In November, 1997, the Debtor, then known as Children's Broadcasting Corporation, purchased a majority shareholding in Harmony Holdings. Ultimately, it became the sole shareholder.

4. At some point after the Debtor acquired an interest in Harmony Holdings, Hoffman sued both Harmony Pictures and Harmony Holdings. He asserted that Harmony Pictures was liable to him for a breach of contract of employment and that Harmony Holdings was liable to him as an alter ego of Harmony Pictures.

5. The Los Angeles County Superior Court granted Hoffman judgment against both Harmony Pictures and Harmony Holdings.

## DISCUSSION

### 1. *Piercing the Corporate Veil: Basic Principles.*

To justify filing his proof of claim in the bankruptcy case of the parent corporation

---

**3.** In pertinent part, this rule provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

**4.** This rule provides that Fed. R. Bankr.P. 7056 applies in "a contested matter in a case under the [Bankruptcy] Code not otherwise

governed by" the Federal Rules of Bankruptcy Procedure.

**5.** The defendants held liable in the Los Angeles County Superior Court took an appeal from the judgment. In an unpublished decision issued on December 4, 2002, the California Court of Appeal, Second District, affirmed the trial court on liability but reduced the amount of the damage award. Its 19–page opinion is a part of the record before this Court. It is available in electronic format at 2002 WL 31716686.

of Harmony Holdings, Hoffman argues that the corporate veil of Harmony Holdings should be pierced, so as to make his claim allowable against the Debtor.

## 2. The Test for Piercing the Corporate Veil under Minnesota Law.

■ Under Minnesota law[6], as under that of other jurisdictions, a corporation is a legal person, distinct from the persons of its shareholder-owners for the purposes of liability on debt and ownership of assets. *Milwaukee Motor Transp. Co. v. Comm'r of Taxation*, 292 Minn. 66, 71–72, 193 N.W.2d 605, 608–609 (1971); *Corcoran v. P.G. Corcoran Co., Inc.*, 245 Minn. 258, 71 N.W.2d 787 (1955); *Di Re v. Central Livestock Order Buying Co.*, 246 Minn. 279, 74 N.W.2d 518 (1956); *General Underwriters, Inc. v. Kline*, 233 Minn. 345, 46 N.W.2d 794 (1951); *Matthews v. Minnesota Tribune Co.*, 215 Minn. 369, 10 N.W.2d 230 (1943).

■ However, a court may disregard this separation of identity, and may pierce the corporate veil to impose liability on equity holders for a debt that is nominally that of the corporation. *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn.1979). *See also G.G.C. Co. v. First National Bank of St. Paul*, 287 N.W.2d 378, 384 (Minn. 1979); *Almac, Inc. v. JRH Dev., Inc.*, 391 N.W.2d 919, 922 (Minn.Ct.App.1986). This remedy is equitable in nature, and is generally not available absent proof of the shareholder's fraudulent or wrongful use of the corporate form. *West Concord Conservation Club, Inc. v. Chilson*, 306 N.W.2d 893, 898 n. 3 (Minn.1981); *G.G.C. Co.*, 287 N.W.2d at 384; *Victoria Elevator Co.*, 283 N.W.2d at 513. The party seeking to have the veil pierced has the burden of proof on a two-pronged test, which has been termed a difficult one to meet. *Agristor Leasing v. Guggisberg*, 617 F.Supp. 902, 906 (D.Minn.1985).

■ Under the first prong, the relationship between the shareholder-owner and the corporation is the focus. The question is whether they maintained the integrity of a separate existence for the corporation, by observing the legal formalities and by keeping a strict segregation in accounting, cash flow, asset ownership, and the like. *Victoria Elevator Co.*, 283 N.W.2d at 512. *See also Barton v. Moore*, 558 N.W.2d 746, 749 (Minn.1997); *Almac, Inc.*, 391 N.W.2d at 922. The observance of technical formalities—like the documented convening of shareholders' and directors' meetings and the issuance of stock—will not suffice to meet this element, where there has been a commingling of assets or conflation of cash flow, or irregularly-documented and ambiguous injections and extractions of shareholders' funds into and out of the corporation. *Victoria Elevator Co.*, 283 N.W.2d at 512–513 and n. 8.

■ Under the second prong, the relationship between the claimant-creditor and the corporation is the focus. The question is whether the shareholder-owners *operated* the corporation "as a constructive fraud or in an unjust manner," in a way detrimental to the claimant. *Victoria Elevator Co.*, 283 N.W.2d at 512. *See also White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn.1982). The purpose for the formation of the corporation is relevant, as is whether the corporation fulfilled that purpose. *Almac, Inc.*, 391 N.W.2d at 924. This prong might be satisfied on proof of an actual false pretense or misrepresenta-

---

**6.** In presenting their arguments, both sides assume that Minnesota state law would govern. Accordingly, the dispute should be treated that way. If California law were applica- ble, the principles would be essentially the same. *In re Ericson*, 50 B.R. 96, 108 n. 17 (Bankr.D.Minn.1985).

tion as to the identity of the real party-beneficiary with whom the creditor was dealing—i.e., the shareholder-owner in an individual capacity, rather than the flimsily-constituted corporation. *Almac, Inc.,* 391 N.W.2d at 923–924. However, the mere channeling of the corporation's monies toward a favored secured creditor, away from satisfying an unsecured creditor-claimant, is not enough in itself. *State v. Woodvale Management Serv., Inc.,* 1998 WL 811554, *3 (Minn.Ct.App.1998); *Assoc. of Mill and Elevator Mut. Ins. Co. v. Barzen Internat'l, Inc.,* 553 N.W.2d 446, 449 (Minn.Ct.App.1996).

■ The sort of unjust conduct that will satisfy the second prong must be a "wrong beyond a creditor's inability to collect" on account of the debt. *Sea–Land Services, Inc. v. Pepper Source,* 941 F.2d 519, 522–523 (7th Cir.1991) (interior quotations omitted). The prong has been deemed satisfied, however, where

> [ ] the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities

upon an asset-free corporation would be successful.

*Id.* at 524. *See also In re Sheridan,* 174 B.R. 763, 768 (Bankr.N.D.Ill.1994); *In re Prairie Trunk Railway,* 1991 WL 214056, *5 (Bankr.N.D.Ill.1991).[7]

### 3. The Parties' Arguments on the Basic Law.

In raising his alter ego theory, Hoffman relied on several facts and circumstances that he says would merit the piercing of the corporate veil of Harmony Holdings. Thus, he saw the Debtor's objection as requiring further investigation and discovery, and an evidentiary hearing.

The Debtor replied by "point[ing] out," *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. 2548, that none of Hoffman's identified points of fact logically went to the second element of the alter ego theory, the existence of a "fundamental injustice" to him that would be promoted and extended were Harmony Holdings' separate legal personality not disregarded.[8] The Debtor emphasizes that Hoffman's original cause of action stemmed from wrongdoing that occurred before the Debtor acquired Harmony Holdings, rendering the liability an *assumed* burden rather than one that the Debtor *created.* It challenges Hoffman to point to any way in which the corporate assets, revenues, or structure of Harmony Holdings were used or maintained after the acquisition in a way that

---

7. The Illinois formulation of "grave injustice" for the second prong in the test cited in these decisions out of the Seventh Circuit is essentially the same as that under Minnesota law.

8. Most of the circumstances initially identified by Hoffman do indeed go to the first prong of the alter ego analysis, primarily or entirely: after the Debtor's acquisition, it and Harmony Holdings maintained the same business address and telephone number and had the same person as a chief executive officer; the board of Harmony Holdings did not hold

"regular" meetings after 1997; and Harmony Holdings was "grossly undercapitalized and insolvent with absolutely no ability to fund its operations." *Victoria Elevator Co. of Minneapolis,* 283 N.W.2d at 512–513 (identifying, *inter alia,* "insufficient capitalization for purposes of corporate undertaking, ... nonfunctioning of other officers and directors, ... and existence of corporation as merely a facade for [shareholder] dealings" as factors relevant to first prong).

was fundamentally inequitable or unfair to him as a claimant or prospective judgment creditor.

Hoffman's rejoinder to this is rather broadly phrased:

> ... the Debtor used Harmony Holdings as a mere conduit for the payment of certain debts to the detriment of other creditors of Harmony Holdings. In other words, Harmony Holdings was used as a shield to protect the Debtor from certain creditors while continuing to fund Harmony Holdings' operations, including, upon information and belief, the funding of Harmony Holdings' defense in the underlying state court lawsuit.

This verbiage is none too illuminating in itself, but other parts of Hoffman's submission put it more into context. As it finally emerged, the gist of the theory is threefold. First, Hoffman maintains, during the period of his litigation the Debtor caused Harmony Holdings to use its financial means (however acquired) to pay other creditors and to satisfy other obligations. As to the materiality of this assertion, there is nothing more than a sparse insinuation; it seems to be that it was unfair that he was not being paid too. Second, he accuses the Debtor of creating a paper insolvency for Harmony Holdings during that period, by making very substantial cash infusions into Harmony Holdings via loans rather than capital investments with issuance of additional stock. Third, Hoffman insists, there was something very wrong about the Debtor simultaneously maintaining a short-term fiscal integrity for Harmony Holdings and vigorously contesting his claims in litigation, when Har-

mony Holdings had little contemporaneous business activity and few or no business prospects.[9]

Hoffman does not produce or cite any concrete evidence to bolster these attacks; in particular, he does not name or even describe any third-party creditors that were "selected," preferred, or favored via the "conduit" that he postulates. He argues that he should be given an opportunity for further discovery to root out these details.

### 4. The Law on the Second Prong in Application.

▮ When the existence of a genuine issue of material fact is the nub of a motion for summary judgment, the respondent has to muster its evidence. *In re Northgate Computer Systems, Inc.*, 240 B.R. 328, 335–336 (Bankr.D.Minn.1999) (collecting cases on shifting of burden of production in summary judgment motion). In that situation, the rule requires that the respondent have had an adequate time for discovery. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 257, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. at 326, 106 S.Ct. 2548; Fed.R.Civ.P. 56(f). However, fending off a motion for summary judgment by a request for more time for discovery is merited only when efficacious—that is, when the respondent has framed a theory of fact that is viable under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (materiality of facts argued in motion for summary judgment is determined by substantive law governing underlying claim or defense). That is not the case here. Under the Minnesota

---

**9.** Hoffman never does identify the creditors against which the Debtor interposed Harmony Holdings as a "shield." As a result, it is unclear just how the claimed strategy even stood to benefit the Debtor. If the constituencies it pitted were only competing creditors of

Harmony Holdings that had no claims against the Debtor, the only conceivable upside was a preservation of the contingent value of its shareholding in Harmony Holdings—a more attenuated benefit.

courts' treatment of the second prong, this matter is ripe for disposition as a matter of law.

▮ Hoffman musters a few specific circumstances and tags them as badges of "fundamental unfairness." Under the Minnesota cases, however, not one of them is.

Initially, standing alone, the alleged undercapitalization of Harmony Holdings after it became the Debtor's subsidiary has no significance. *Assoc. of Mill and Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d at 450; *Almac, Inc.*, 391 N.W.2d at 923.[10] Next-and more to the point of Hoffman's specific theory-the Minnesota courts have expressly declined to find "fundamental unfairness" where a shareholder continued to fund the operations of a corporation by loans or other infusions during a time when current business revenues would have been insufficient to meet current debts. *Assoc. of Mill and Elevator Mut. Ins. Co.*, 553 N.W.2d at 450–451; *Almac, Inc.*, 391 N.W.2d at 923–924. This result obtains even where the corporation has failed to reduce debt outstanding to the complaining creditor, or a class of creditors of which it is a member, during the period when the corporation is receiving the infusions. *Assoc. of Mill and Elevator Mut. Ins. Co.*, 553 N.W.2d at 450–451.

The drift of these decisions is clear: there is nothing "fundamentally unfair" about a parent corporation propping up a financially-ailing subsidiary, by enabling it to meet current expenses of ordinary operation, while at the same time funding the good faith defense of a large contested claim in litigation against the subsidiary.[11] Inherently and intuitively, there is nothing "unfair" in a shareholder or parent corporation subsidizing a separate corporate vehicle that might have further business options or market share after the resolution of a large claim that antedated the shareholder's or parent's acquisition of the company. The case for "unfairness" would be more arguable if the claim had arisen after the acquisition, particularly under interlocked management, but that is not the way it was here.

Next, Hoffman has identified no legal authority for his insinuation that the Debtor acted unfairly in directing all of its resources to paying other creditors and to funding its defense of his claim, rather than confessing liability and paying him something. Hoffman undoubtedly believes that the merits of his claim were patent throughout. He has some support, via his results in the California courts. However, he cites no circumstance of the litigation or the state court's decisions, nor any authority in general law, that shows that the Debtor was out of bounds in vigorously defending his claim, and in expending substantial resources to do so even when its business prospects were waning. As to

**10.** This rule is founded on simple common sense. After all, the insolvency of the subject, legally-liable corporation is just part of the terrain in an alter ego action; a creditor would not be looking to a shareholder or parent corporation for recourse if the failed entity had had the ability to respond to judgment. The Minnesota Supreme Court recognized this: "any business which fails can probably be said to have been undercapitalized." *Snyder Electric Co. v. Fleming*, 305 N.W.2d 863, 868 (Minn.1981) (interior quotation marks omitted). This little verity is even more sound in this forum than in the state courts. *In re Ericson*, 50 B.R. at 109. *See also Sea–Land Servs., Inc. v. Pepper Source*, 941 F.2d at 522–523.

**11.** One may wonder about the motivation to do such a thing, particularly when prolonged litigation may be discouraging prospective customers or chilling outside investment. However, Hoffman has cited no law that makes such motivation relevant.

the payment of other creditors' claims, his accusations of unfairness would more logically support proceedings to avoid preferential transfers in a bankruptcy case that was never commenced—one in which Harmony Holdings would have been the debtor. These considerations are not actionable in this case.

Finally, Hoffman simply does not make sense in his suggestion that the Debtor acted nefariously by loaning to Harmony Holdings rather than purchasing further equity in exchange for its cash infusions. As noted earlier, the paper insolvency resulting from debt rather than investment is irrelevant. More to the point, the money was still there for the subsidiary's use, *de facto*, regardless of the vehicle through which it was garnered. From this record, there is no onus to be attached to any aspect of Harmony Holdings' actual use. There is simply no unfairness discernible from the chosen form of the Debtor's infusions into Harmony Holdings.

In sum, none of the circumstances that Hoffman identifies are material to the second prong of his theory to hold the Debtor liable, and he has not identified any other way to meet the prong. The very history and structure of the Debtor's relationship suggest nothing more than an acquiring parent corporation trying to preserve any value that inhered in its investment, by holding the subsidiary together pending the resolution of a large pre-existing claim in suit. There is nothing here to even suggest that the Debtor maintained Harmony Holdings to hoodwink Hoffman in some way, let alone to prove it. Perhaps Hoffman thinks that he was waylaid by the collapse of Harmony Holdings after his now-pyrrhic victory in the California courts. However, a collapse occasioned by the cessation of a parent company's subsidy is no more subject to judicial sanction than one occasioned by internal, "natural"

causes. The one necessarily leaves creditors of the subsidiary holding the bag, as much as the other does.

### 5. Conclusion.

Hoffman has not identified a theory of fact, based on evidence known or capable of discovery, that is material to the second essential element of his legal theory to affix liability in the Debtor. As a result, there is no warrant for conducting further discovery. Hoffman's theory of defense to the Debtor's objection is ripe for adjudication as a matter of law. The result has to be adverse to him, because he could not prove up a "fundamental unfairness" that would be fostered by maintaining the separate legal personality of the Debtor's subsidiary, and then declining to hold the Debtor liable for the adjudged debt of the subsidiary.

As a matter of law, the corporate veil of Harmony Holdings may not be pierced in favor of Hoffman. The Debtor has stated a proper objection to Hoffman's claim: the Debtor simply is not legally liable on it.

### ORDER

On the memorandum of decision just made,

IT IS HEREBY ORDERED:

1. The Debtor's objection is sustained.

2. The claim of Ron Hoffman, filed as claim no. 55, is disallowed in its entirety.